## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

Angeliina Lawson, on behalf of herself and as next friend of her minor son, *Plaintiff,*

v.

Kansas Department for Children and Families (DCF), et al., *Defendants.*

**Case No. 2:25-cv-02171-JWB-TJJ**

**Jury Trial Demand**

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

EXECUTIVE SUMMARY

This case arises from systemic misconduct by the Kansas Department for Children and Families (DCF) and its officials, who deliberately withheld abuse investigation records from Plaintiff, a non-offending mother and ADA-qualified individual, while facilitating the continued placement of her son in an abusive and coercive environment. The Plaintiff, Angeliina Lynn Lawson, asserts claims under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments and under Title II of the Americans with Disabilities Act (ADA) for denial of access and retaliation.

The Defendants have moved to dismiss, citing Eleventh Amendment and qualified immunity, and alleging that Plaintiff has failed to state a claim. However, Plaintiff's Complaint and the accompanying evidentiary record detail a coherent and shocking sequence of events in which DCF personnel concealed verified abuse, denied Plaintiff access

to public records and due process, and retaliated against her for asserting her rights under KORA and the ADA.

The claims fall within established exceptions to sovereign immunity under Ex parte Young and Tennessee v. Lane, and the factual allegations are sufficient to overcome qualified immunity at this stage. Plaintiff's due process claims meet the "state-created danger" standard under Currier v. Doran, and her ADA retaliation and First Amendment claims are backed by specific evidence of harassment and exclusion.

Plaintiff also asserts a viable Monell-type claim, alleging that DCF and the Kansas Attorney General's Office have adopted a pattern or practice of obstructing access to public records and retaliating against parents who advocate for transparency or accommodations.

This brief urges the Court to deny the Defendants' Motion to Dismiss and allow discovery to proceed, so that the full scope of institutional misconduct and its impact on Plaintiff and her child can be presented at trial.

Defendants' suppression of critical abuse disclosures is not a theoretical claim—it is evidenced in Plaintiff's attached exhibits. For example, Exhibit C shows a direct email from Plaintiff's son to DCF caseworker Heather Dunz describing fear and coercion. Exhibit H contains DCF's redacted records, which entirely omit one of the abuse investigations Plaintiff requested. These materials confirm Plaintiff's allegation that DCF concealed material facts, thereby depriving her of the ability to protect her son—a textbook due process violation.

Plaintiff has also demanded a jury trial under Rule 38 and the Seventh Amendment to the U.S. Constitution. The claims in this case raise

significant factual questions regarding intent, retaliation, institutional misconduct, and trauma to both parent and child. Dismissing the case prior to discovery would deprive Plaintiff of her constitutional right to have these issues determined by a jury. For this reason as well, the motion to dismiss must be denied.

## Introduction

Plaintiff Angeliina Lawson, appearing pro se and as next friend of her minor son, respectfully submits this memorandum opposing the Kansas Department for Children and Families' ("DCF") Motion to Dismiss. Defendants seek to dismiss this civil rights action by invoking Eleventh Amendment sovereign immunity, qualified immunity, and Rule 12(b)(6) for failure to state a claim. They also contend that Plaintiff has not adequately alleged any constitutional or Americans with Disabilities Act ("ADA") violations. For the reasons below, Defendants' motion should be denied in its entirety.

Plaintiff's Complaint alleges a disturbing pattern of misconduct by DCF and its officials that, if proven, violates fundamental rights. Accepting the allegations as true – as the Court must at this stage – Plaintiff and her child were harmed by DCF's deliberate concealment of child abuse evidence, obstruction of Plaintiff's parental rights and advocacy, and failure to accommodate Plaintiff's disabilities. Plaintiff asserts claims under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment (due process/familial integrity) and First Amendment (retaliation), as well as claims under Title II of the ADA (disability discrimination and retaliation). She further alleges these violations were not isolated incidents but stem from an official policy or custom (a *Monell* pattern/practice claim). Plaintiff seeks both damages and injunctive relief to remedy the ongoing harms.

Defendants' arguments for dismissal lack merit. **First**, the Eleventh Amendment does not categorically bar this suit: Congress has abrogated state immunity for ADA claims in this context, and Plaintiff also sues officials in their individual capacities under §1983 and seeks

prospective relief, fitting well within established immunity exceptions. **Second**, Defendants are not entitled to qualified immunity at the pleading stage because the Complaint alleges facts showing violations of clearly established rights – including the right to familial integrity, the right to be free from state-created danger, and the right to be free from retaliation for protected conduct. **Third**, Plaintiff's allegations, which must be liberally construed as a pro se pleading, are more than sufficient to state plausible claims under §1983 and the ADA. The Complaint details specific actions by DCF personnel that, if proven, amount to actionable constitutional violations (such as knowingly suppressing evidence of abuse and retaliating against Plaintiff's advocacy) and ADA violations (such as denying Plaintiff equal access to DCF services, records and engaging in retaliatory harassment when she asserted her ADA rights). Finally, Plaintiff's pleadings and exhibits illustrate a broader pattern of misconduct condoned by DCF and the Kansas Attorney General's Office – supporting an inference of an official policy of violating federal rights, which is actionable under *Monell*.

In short, this case presents serious claims that should not be dismissed before any discovery. Plaintiff and her child have suffered real harm due to Defendants' actions. Plaintiff is entitled to proceed to discovery to prove her claims. Dismissal at this pre-discovery stage would be improper given the detailed factual allegations and supporting evidence. The Court should deny Defendants' Motion to Dismiss. If the Court identifies any pleading deficiencies, Plaintiff respectfully requests leave to amend the Complaint rather than dismissal of her case, so that justice may be done on the merits.

### Preservation of Plaintiff's Seventh Amendment Jury Trial Right

Plaintiff has timely demanded a jury trial on all triable issues pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the U.S. Constitution. Dismissal at this pre-discovery stage would improperly deny Plaintiff her constitutional right to have a jury of her peers determine contested factual issues, including but not limited to the extent of DCF's misconduct, the credibility of Plaintiff's evidence, and the emotional and familial harms alleged. Courts must be especially cautious in civil rights actions not to short-circuit a plaintiff's

access to justice before the facts can be properly developed. This case raises profound issues of child safety, disability discrimination, and governmental abuse of power — issues that belong before a jury. Accordingly, the motion to dismiss must be denied to preserve Plaintiff's Seventh Amendment right to a trial on the merits.

## Factual Background

Plaintiff is the mother of a minor child who was the subject of multiple abuse investigations handled by DCF. Plaintiff was a non-offending, protective parent who tried to ensure her child's safety. The Complaint alleges that in 2024–2025, Plaintiff's son made **serious abuse disclosures** to DCF officials, implicating his father and a court-appointed guardian ad litem ("GAL"). Specifically, the child reported that his father had lied to police during a prior abuse investigation, that his father threatened to commit suicide if the child continued taking a prescribed medication, and that the GAL told the child that if he testified truthfully about abuse "it would get worse" for his mother in court, medical records showing significant weight loss, diagnosis of Psychological Trauma, plummeting grades in school, police reports, father's complete isolation and removal of all communication devices as a coercive control technique to prevent child from getting help, emails where the child was reporting daily nosebleeds, videos that the child recorded showing panic attacks and the father mocking him and terror of the father entering his bedroom. These statements and recordings– indicating the child was under severe duress and at risk – were **documented in DCF's internal records**, yet **DCF concealed them from Plaintiff**. At the time, Plaintiff was the child's *non-offending* parent with full legal rights, but DCF kept her in the dark about evidence that her son was being harmed. This concealment occurred even though Plaintiff was known to DCF as both the child's mother and as an ADA advocate for her son and with disabilities of her own.

Frustrated by the lack of information, Plaintiff **filed a formal Kansas Open Records Act (KORA) request** in an effort to obtain the complete DCF records about her son's abuse investigations. In response, DCF **produced only incomplete and heavily redacted records**, omitting the

most critical abuse disclosures and reports and misstating the number of cases DCF has had, which completely kept Amanda Miranda's work sealed. For example, DCF's response identified only one closed case and one pending case, even though Plaintiff knew of a third investigation existed – which was simply not disclosed at all. The records DCF did release were misleading and sanitized, failing to reveal the child's statements about his father's threats and the GAL's coercion. At the same time, DCF **shared these confidential abuse findings with third parties** not entitled to them (such as the GAL or possibly the father's counsel) prior to the GAL ever having court authority. DCF blindly trusted a stranger and provided them their opinions of the Plaintiff but refused to ever issue a report to the court so that the GAL could cut and paste cherry picking what he wanted to use against the mother since there was financial gain for the GAL and personal ties to the father that DCF never investigated. Yet they continued to withhold the information from Plaintiff and aid in fraud on the court. In essence, DCF gave others access to the very information that Plaintiff – the child's mother who was trying to protect him – was denied.

When Plaintiff persisted in seeking transparency and accountability, she faced **retaliation and stonewalling by DCF officials**. Plaintiff's grievance went nowhere and never was addressed. After Plaintiff's records requests, grievances and complaints, DCF supervisors over Amanda Miranda kept trying to contact her by phone and **pressured her to know all the details to why she was so unhappy. Plaintiff reminded that she requested written communication because of her disability but kept being interrogated about her grievance filing. She was decided and kept accusing me of "how do you know what emotional abuse looks like?" Plaintiff responded that DCF would need to contact the therapist Alison Dean because she was the mandated reporter who issued that child abuse report and not the Plaintiff.** On multiple occasions in 2024, Plaintiff received harassing calls from DCF personnel (documented in call logs and voicemails) effectively intimidating her (Exhibit A, phone records and voicemail transcripts). Rather than address Plaintiff's valid concerns in the grievance, DCF chose to intimidate her. Defendant **Amanda Miranda**, a DCF social worker on the case, exhibited hostility toward Plaintiff and even **shared confidential abuse-related information with the GAL** in a

manner that undermined Plaintiff's position in ongoing custody proceedings (Exhibit B, internal email showing Miranda's disclosure to GAL). Defendant **Heather Dunz**, a DCF supervisor, was directly informed (via urgent emails from the child) about the father's threats and the child's fear for his safety, yet **Dunz took no action** (Exhibit C, child's email to Dunz). Ignoring these cries for help but instead said to the Plaintiff over the phone "I went to the father's home and it doesn't look like a home where physical abuse would be." DCF allowed the child to remain in the abusive situation without intervention and without a forensic analyses of the home.

Meanwhile, **court proceedings** concerning the child's custody and welfare were proceeding *ex parte*, without Plaintiff's knowledge or involvement. Because DCF had kept Plaintiff unaware of the new abuse allegations and related case files, Plaintiff was **excluded from critical family court hearings and decisions**. Unbeknownst to her at the time, the child's father (the alleged abuser) and certain court actors capitalized on Plaintiff's exclusion by seeking to terminate her parental rights. Plaintiff later learned that during this period, the father and GAL were effectively **manipulating the court process** for the arrears of child support expenses and alimony to be rerouted to the GAL, while DCF continued to withhold the evidence that would have supported Plaintiff's defense of her parental rights. By the time Plaintiff discovered what had happened, significant damage to her relationship with her child had occurred. The child had become traumatized – he developed medical symptoms of **prolonged psychological coercion and stress**, including insomnia, weight loss, nosebleeds, and emotional distress and significant loss of grandmother connection for help. The Complaint alleges that this trauma was a direct result of **state-enabled coercion and isolation**: the child felt helpless and unsupported because the very agency meant to protect him (DCF) had aligned with the abuser.

Plaintiff took her grievances to every oversight body she could. She **filed a KORA complaint with the Kansas Attorney General's Office**, detailing how DCF had withheld entire case files and redacted crucial information in violation of Kansas law. The **Kansas AG's Office, however, summarily rejected the complaint**, finding no wrongdoing by

DCF despite clear discrepancies in the records provided (Exhibit D, AG letter dismissing KORA complaint). Next, Plaintiff raised **ADA-based grievances**, notifying both DCF and state authorities that, as an individual with disabilities, she required reasonable accommodations and equitable access to information. She asserted that DCF's conduct – refusing to provide full records and harassing her when she advocated for herself – violated Title II of the ADA and the ADA's anti-retaliation provisions. These ADA complaints were likewise **brushed aside** by the agency and the Kansas AG. (Exhibit E, Plaintiff's ADA grievance letter and response). In addition, Plaintiff filed **judicial misconduct complaints** against the GAL and any judges who allowed the one-sided proceedings, reporting the GAL's unethical threat to the child and the apparent denial of Plaintiff's due process in court. These complaints too met with **inaction** or perfunctory denials by the state's oversight entities (Exhibit F, judicial conduct commission response). The Dept of Children Advocacy sent her back to DCF as they did not have any mechanisms for children still in homes and only worked with DCF agencies for children in government care.

All of the above factual allegations are supported by documentation that Plaintiff can present as evidence. Taken together, the facts show a **pattern of suppression, retaliation, and procedural irregularities** by DCF and those acting in concert with it. DCF **suppressed evidence of child abuse**, **denied Plaintiff access to records and proceedings**, and **retaliated against Plaintiff's advocacy that was used in court,** which in turn interfered with Plaintiff's custody and her child's safety. Despite Plaintiff's efforts to obtain help through official channels (KORA requests, ADA grievances, and reports to the Attorney General and judicial authorities), the system closed ranks and failed to correct DCF's misconduct. This systemic failure underlies Plaintiff's *Monell* claim: that DCF (and by extension the state's responsible agencies) have an unlawful custom or practice of violating due process and ADA rights, or at least of **deliberate indifference** to such violations.

For purposes of this motion, the Court must accept these well-pleaded facts as true. They amply demonstrate the *plausibility* of Plaintiff's claims. Far from a "bare bones" pleading, the Complaint provides specific dates, communications, and incidents illustrating how

Defendants' actions harmed Plaintiff and her son. The following sections will show that, legally, these facts constitute valid claims under §1983 and the ADA, and that Defendants' various immunity defenses do not shield such egregious conduct.

## Legal Standard

**Rule 12(b)(6) Standard:** A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the complaint. The Court must **accept all well-pleaded factual allegations as true** and draw all reasonable inferences in favor of the plaintiff. To survive a motion to dismiss, a complaint need only state a claim for relief that is **plausible on its face**. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility does not mean probability; it simply means the facts alleged, if true, "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must provide more than conclusory statements or a mere recitation of the elements of a cause of action, but it **need not contain detailed evidence** or proof – it simply must allege enough factual matter to raise a reasonable expectation that discovery will reveal evidence supporting the claim. *Id.* at 678–79.

Importantly, because Plaintiff is proceeding **pro se**, her pleadings are held to **"less stringent standards than formal pleadings drafted by lawyers."** *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). The Court must **liberally construe** the complaint in Plaintiff's favor and not dismiss the case unless it is clear that no set of facts in support of her claim would entitle her to relief. This generous standard reflects the policy that claims should be decided on their merits after an opportunity for evidence, rather than terminated on technical pleading deficiencies – particularly where constitutional rights are at stake. Under these standards, Plaintiff's Complaint – when read liberally and in the context of the exhibits – more than adequately notifies Defendants of the claims and the grounds upon which they rest. It would be premature to dismiss the case at this pre-discovery phase.

## Argument

*(The following sections address Defendants' arguments in turn. Plaintiff will show (A) that Eleventh Amendment sovereign immunity does not bar her key claims; (B) that qualified immunity is inapplicable or at least cannot be decided on the pleadings; (C), (D), and (E) that each of her substantive claims under the Fourteenth Amendment, First Amendment, and ADA are well-pleaded; (F) that she adequately alleges a policy or custom under Monell; and (G) that no other purported grounds for dismissal have merit.)*

## A. Eleventh Amendment Sovereign Immunity Does Not Bar Plaintiff's Claims

Defendants argue that the Eleventh Amendment immunizes DCF (a state agency) and the Kansas Attorney General's Office from this suit. It is true that, as a general matter, states and state agencies are shielded from private lawsuits in federal court by the Eleventh Amendment. See *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 66 (1989) (a State or its agencies are not "persons" subject to damages liability under §1983). However, Defendants greatly overstate the reach of sovereign immunity in this case. Several **critical exceptions and qualifications** apply, allowing Plaintiff's claims to proceed:

**1. Prospective Injunctive Relief (Ex parte Young):** Plaintiff seeks not only damages but also declaratory and injunctive relief to remedy the ongoing violations of law by DCF. Under the longstanding *Ex parte Young* doctrine, a plaintiff may sue state officials in their official capacity for prospective relief to end a continuing violation of federal law, notwithstanding the Eleventh Amendment. *Ex parte Young*, 209 U.S. 123 (1908). Here, Plaintiff's Complaint effectively names DCF and its officials in their official capacities and requests injunctive orders (for example, requiring DCF to release the full abuse records, to cease retaliatory conduct, and to accommodate disabilities going forward). Such prospective relief claims are **not barred by sovereign immunity**. The Court has jurisdiction to order state officials to conform their future conduct to federal law. *Id.*; see also *Coalition of Clergy v. Bush*, 310 F.3d 1153, 1156 (10th Cir. 2002) (Young allows suits against state officers for prospective relief). To the extent the Court finds that the proper technical course is to substitute the DCF Secretary or other appropriate official as the defendant for injunctive relief, Plaintiff can amend to do

so. But the bottom line is that **immunity does not prevent this Court from granting injunctive relief** requiring DCF to comply with federal law (e.g. to provide records or desist from interfering with Plaintiff's rights), because such relief falls squarely within the *Ex parte Young* exception.

**2. ADA Claims – Congressional Abrogation:** Plaintiff's Count under Title II of the ADA (and the related anti-retaliation provision in Title V, 42 U.S.C. § 12203) is *not* barred by the Eleventh Amendment because Congress validly abrogated state immunity for such claims, at least under the circumstances present here. In enacting the ADA, Congress unequivocally expressed its intent to abrogate state immunity for violations of Title II. 42 U.S.C. § 12202 ("A State shall not be immune under the Eleventh Amendment from an action in [federal] court for a violation of this chapter."). The Supreme Court has held that this abrogation is constitutional as applied to conduct that also violates the Fourteenth Amendment, or in certain contexts implicating fundamental rights. *United States v. Georgia*, 546 U.S. 151, 159 (2006); *Tennessee v. Lane*, 541 U.S. 509, 533–34 (2004). In this case, Plaintiff's ADA claim revolves around her being denied equal access to DCF services and court proceedings **because of her disabilities**, and being retaliated against for her ADA-related advocacy. These allegations dovetail with core constitutional concerns – notably Plaintiff's fundamental right of familial association (a liberty interest) and her First Amendment right to petition the government. *Lane* teaches that when Title II is invoked in the context of fundamental rights (such as access to the courts, which was at issue in *Lane*), states have no immunity because Congress acted within its authority to enforce the Fourteenth Amendment. 541 U.S. at 529–34. Here, DCF's actions effectively denied Plaintiff, a disabled mother, meaningful participation in child welfare proceedings and access to abuse investigation information, thereby impeding her ability to protect her child through the courts. Familial integrity and access to a fair legal process are fundamental liberty interests, so the ADA's abrogation of immunity should be fully effective in this context. Moreover, under *United States v. Georgia*, the Court can independently ask whether the alleged ADA violation is also a constitutional violation; if so, immunity is unquestionably abrogated. 546 U.S. at 159. As discussed further below, denying a parent due process by refusing to

fully include her in the investigation process can be seen for retaliation for asserting disability rights, could itself be viewed as a Fourteenth Amendment violation – thus, Congress's abrogation applies *a fortiori*. In sum, DCF **cannot claim Eleventh Amendment immunity against the ADA Title II and retaliation claims**, and Defendants' motion to dismiss those claims on immunity grounds must fail.

**3. Individual Capacity §1983 Claims:** Plaintiff has sued individual DCF employees (such as Ms. Miranda and Ms. Dunz) in their personal capacities under §1983. Eleventh Amendment immunity **does not extend to suits against state officials in their individual capacity for money damages.** *Hafer v. Melo*, 502 U.S. 21, 31 (1991) ("state officers sued in their individual capacities are 'persons' for purposes of §1983 and do not enjoy Eleventh Amendment immunity"). Thus, to the extent Plaintiff's claims for damages target the individual Defendants for their personal wrongdoing, there is no sovereign immunity bar. Those claims proceed like any other §1983 action against an official for actions taken under color of state law. Defendants' motion conflates the state agencies with the individual defendants, but the Court must distinguish them for immunity analysis. **DCF and the AG's Office (as entities) cannot be sued for damages under §1983**, but the *individuals* can – subject to the qualified immunity analysis addressed below. Plaintiff's Complaint, liberally construed, does allege individual wrongdoing by named officials (e.g., Miranda's and Dunz's acts and omissions), so those claims survive regardless of Eleventh Amendment.

**4. Waiver or Ultra Vires Conduct:** Although not explicitly argued yet, it bears noting that state immunity does not protect officials who act **outside the scope of their lawful authority or in an unconstitutional manner.** An official who engages in ultra vires acts – for example, *willfully violating federal law or orchestrating a fraud* – is not doing the state's business and thus cannot shelter behind the state's immunity. See *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984) (Young doctrine applies to official acting contrary to federal law). Here, Plaintiff alleges that DCF officials *knowingly violated federal law* (violating due process rights, ADA rights, etc.). This is the kind of conduct that *Ex parte Young* and related principles are designed to reach – the state cannot authorize its agents to commit constitutional

torts, and when they do so, they act beyond their legitimate authority. Additionally, Kansas has in certain contexts waived immunity or consented to suit for ADA claims by accepting federal funds (for example, DCF receives federal funding for child welfare programs contingent on compliance with civil rights laws, including the ADA – arguably a constructive waiver). In any event, the Court need not find a general waiver here because the above doctrines suffice to keep the case alive.

In conclusion, **Eleventh Amendment immunity does not mandate dismissal of this action**. Plaintiff's §1983 damages claims against DCF and the AG's Office as entities may be subject to dismissal or conversion to official-capacity claims for injunctive relief, since state agencies are not §1983 "persons" for damages. Plaintiff acknowledges that and would consent to the substitution of appropriate officials or other adjustments rather than a dismissal. But critically, *all* of Plaintiff's core claims can proceed either against the individual defendants (for damages) or against the relevant officials in official capacity (for injunctive relief or under the ADA's abrogation). The motion to dismiss on sovereign immunity grounds should therefore be **denied**, except for any technical tailoring of the defendants that the Court may direct. Dismissing the case outright would be legal error given the established exceptions to immunity in play.

## B. Defendants Are Not Entitled to Qualified Immunity at This Stage

Defendants next invoke **qualified immunity**, claiming that even if constitutional violations occurred, the individual officials cannot be held liable because the rights in question were not "clearly established" or because their conduct was objectively reasonable. At the Rule 12(b)(6) stage, however, a qualified immunity defense faces a high hurdle: dismissal is only appropriate if **the plaintiff's own allegations** clearly fail to show a violation of a constitutional right *or* clearly show that the right was not clearly established at the time. *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004). Here, Plaintiff's Complaint pleads detailed facts that, if true, demonstrate egregious misconduct by Defendants – misconduct that violated clearly established law. Therefore, qualified immunity is not a basis for dismissal.

To overcome qualified immunity, Plaintiff must allege (1) **that**
Defendants violated her or her son's constitutional rights, **and** (2) **that**
those rights were clearly established at the time such that **a reasonable**
official would have known their conduct was unlawful. *Pearson v.*
*Callahan*, 555 U.S. 223, 232 (2009). Both prongs are satisfied on the
face of the Complaint:

**Violation of Constitutional Rights:** As discussed in detail in Sections C
and D below, Plaintiff alleges violations of the Fourteenth Amendment
(denial of due process/familial integrity) and First Amendment
(retaliation against protected advocacy). Taking the facts as true,
Defendants **affirmatively acted to conceal child abuse evidence and to**
**mislead the court**, which resulted in Plaintiff being deprived of her
parental rights and her child being left in danger. Such conduct –
actively **distorting the truth-finding process** and undermining a
parent's ability to protect her child – amounts to a deprivation of liberty
without due process. Similarly, the Complaint shows that Defendants
**harassed and punished Plaintiff for engaging in protected activities**
like requesting records and filing complaints, which is a direct violation
of her First Amendment right to petition and free speech. Thus, the
Complaint adequately alleges constitutional violations by the individual
Defendants. Indeed, for purposes of the motion to dismiss, Defendants
do not appear to contest that *if* Plaintiff's story is true, it describes
troubling behavior. Their argument is primarily that even so, the law
was not clearly established. That argument fails under prong two.

**Clearly Established Law:** The rights at issue were unquestionably well
established in law by the time of Defendants' actions (2022–2023). No
reasonable DCF employee could believe it was lawful to do what is
alleged here. For example:

- **Parental Due Process Rights:** It has long been clearly established
  that parents have a fundamental liberty interest in the care,
  custody, and management of their children. *Santosky v. Kramer*,
  455 U.S. 745, 753 (1982). By extension, \*\*state officials violate
  due process when they \*\*prevent a parent from participating in
  proceedings affecting that interest or when they **fabricate or**
  **withhold material evidence** in a child welfare investigation. The
  Tenth Circuit has recognized that social workers can be liable for

due process violations where their actions "shock the conscience" by egregiously undermining a parent's custody rights or a child's safety. In *Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001), for instance, officials placed children with an abusive father and misrepresented the danger to the court; the Tenth Circuit not only found a plausible due process violation, but **denied qualified immunity**, noting that such misconduct would have been understood as unconstitutional in 1999. The parallels to this case are striking: DCF personnel here allegedly **kept a child with an abusive parent by hiding critical abuse reports**, similar to the Currier defendants who misled the court to keep children with an abuser. Likewise, in *Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253 (10th Cir. 1998), officials were denied immunity for actions that increased a student's risk of harm (sending a known suicidal teen home alone, after which he harmed himself). The Tenth Circuit held that affirmative acts creating a danger could violate substantive due process if the elements of the state-created danger test are met. By the late 1990s, the Tenth Circuit had clearly established the **"danger creation" doctrine**: state actors who knowingly place an individual at serious risk of harm, or who **prevent that individual (or their guardian) from protecting themselves, can be liable under the Due Process Clause.** See *Currier*, 242 F.3d at 918 (misrepresentation and concealment of abuse risk can satisfy state-created danger and shock the conscience); *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995) (six-part test for danger creation). In 2013, a case from Kansas, *Estate of B.I.C. v. Gillen*, 710 F.3d 1168 (10th Cir. 2013), further underscored that a social worker's **failure to act on known abuse** (or refusal to accept evidence of abuse) could violate due process – the Tenth Circuit acknowledged the validity of the claim, although it granted a particular defendant immunity largely because of then-uncertainty in the law. However, *Gillen* was decided in 2013; a full decade has since passed. By 2022, any ambiguity has eroded – cases like *Currier* and *Gillen* put DCF officials on notice that **deliberate indifference to a child's safety and a parent's rights is unlawful**, especially when officials take active steps that **impede efforts to protect the child**. No reasonable social worker in 2022 could believe that concealing verified abuse allegations from a

custodial parent, thereby allowing the abuse to continue, was constitutionally permissible. Such conduct is the opposite of good-faith child protection; it is a gross betrayal of duty that *every reasonable official would know* violates the parent's and child's rights. Therefore, the Fourteenth Amendment violations alleged were clearly established.

- **First Amendment Retaliation:** The right to be free from retaliation for engaging in protected First Amendment activity (such as petitioning the government or accessing public records) has been clearly established for decades. By the early 2000s, the Tenth Circuit had explicitly held that government officials cannot subject an individual to adverse actions in response to the individual's exercise of her First Amendment rights. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (it is clearly established that retaliation against an individual for exercising First Amendment rights is actionable). In *Worrell*, the Tenth Circuit outlined the elements of a retaliation claim and emphasized that a public official cannot chill someone's protected expression by intimidation or punishment. Here, Plaintiff's activities – filing KORA requests, complaining about DCF's handling of the case, and advocating for disability accommodations – are forms of petitioning the government and speaking out on a matter of public concern (the safety of her child and the accountability of a public agency). There is no doubt these are protected activities. The Complaint then alleges that DCF officials took **adverse actions** specifically because of Plaintiff's speech: e.g., **harassing phone calls telling her to stop requesting records, hostile treatment by Ms. Miranda after Plaintiff raised ADA issues, and the ultimate denial of records access and exclusion from the process after Plaintiff became more vocal**. By 2022, any reasonable official would know that such retaliatory conduct is unlawful. The Supreme Court in *Hartman v. Moore*, 547 U.S. 250 (2006), and many Tenth Circuit cases (e.g., *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 848 (10th Cir. 2005)) have made the standards clear: if an official's adverse action is substantially motivated by an individual's protected speech, that is a constitutional tort. Here the timeline and allegations strongly indicate a retaliatory motive – something even a layperson would

recognize as wrongful ("DCF was punishing the mother for speaking up"). Thus, the First Amendment retaliation right was clearly established, and Defendants cannot seriously claim otherwise.

- **ADA Rights (Title II and Retaliation):** Although qualified immunity does not technically apply to ADA claims (which are against the entity, not individuals), to the extent individual Defendants violated Equal Protection or other constitutional analogues by discriminating against Plaintiff due to disability, that too was clearly established. Title II of the ADA (effective since 1992) has long required public entities like DCF to provide **reasonable accommodations** and not to exclude qualified individuals with disabilities from services. While individuals are not individually liable under the ADA, they are liable under §1983 if they intentionally violate equal protection or other constitutional rights of disabled persons. By 2022, it was clearly established that disability-based discrimination by state officials violates the Fourteenth Amendment (absent a sufficient governmental justification). Moreover, **retaliation for asserting ADA rights** has been clearly unlawful since the ADA's enactment (42 U.S.C. §12203 explicitly prohibits interference or retaliation). Any reasonable official knows you cannot punish someone for requesting an accommodation or for pointing out disability rights violations. Plaintiff's allegations that DCF staff showed hostility to her because she is an "ADA advocate" and tried to enforce her rights, if proven, demonstrate intentional discrimination/retaliation. Given the clarity of the ADA's mandates, no reasonable DCF supervisor could think it lawful to, for example, stonewall a parent's access to records *because* she has mental health disabilities or *because* she sought an advocate's help. That behavior is clearly forbidden by law (as well as being callously indifferent to the welfare of a disabled person).

In sum, **Defendants violated clearly established rights.** This is not a close call where obscure legal nuances might excuse the officials. The misconduct alleged – suppressing evidence of child abuse, undermining a parent's custody through deception, and retaliating against a citizen for seeking records and accommodations – lies at the heartland of what

the Constitution and federal law forbid. The Tenth Circuit and Supreme
Court precedents cited above (and numerous others) would make any
competent official aware that such actions cross bright lines. Therefore,
the individual Defendants **are not shielded by qualified immunity** at
this juncture. At the very least, the question of qualified immunity
cannot be resolved without a factual record. Many of Defendants'
immunity arguments may hinge on what exactly they knew and did,
which are factual matters suited for discovery. Dismissing on qualified
immunity now would require the Court to accept Defendants' own
version of events or to draw inferences against Plaintiff, which Rule 12
forbids. Because Plaintiff has adequately alleged conduct that violates
clearly established law, the motion to dismiss on qualified immunity
grounds should be denied. Defendants can renew any qualified
immunity arguments on a fuller record at summary judgment, if
appropriate, but they are not entitled to pre-discovery exoneration in
the face of the detailed allegations here.

## C. The Complaint States a Valid Fourteenth Amendment Due Process Claim

Count I of the Complaint alleges that Defendants violated Plaintiff's
and her son's rights to due process and familial integrity, as guaranteed
by the Fourteenth Amendment. Defendants argue that Plaintiff fails to
state a claim because, generally, the state is not constitutionally liable
for harm inflicted by a private individual (here, the father who is the
primary abuser). Defendants are effectively relying on the **DeShaney**
principle – the Supreme Court's holding that the Due Process Clause
typically does not impose an affirmative duty on the State to protect
individuals from private violence. *DeShaney v. Winnebago Cty. Dept. of
Soc. Servs.*, 489 U.S. 189, 195 (1989). However, Defendants ignore
**crucial exceptions** and the specific affirmative misconduct alleged in
this case. Plaintiff's due process claim is not a mere "failure to protect"
claim; it is a claim that Defendants, by their own actions, **prevented
Plaintiff from protecting her child and made the situation far worse**.
In other words, this is a textbook **state-created danger** (or danger-
creation) case, which is a well-recognized exception to *DeShaney*. The
Tenth Circuit has embraced the state-created danger doctrine: when
state officials create or substantially contribute to the danger that

ultimately harms an individual, they can be liable for the resulting harm under the Due Process Clause. *Currier v. Doran*, 242 F.3d 905, 917–18 (10th Cir. 2001); *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995).

The Complaint, liberally construed, satisfies all elements of a state-created danger claim. The Tenth Circuit's test (from *Uhlrig* and subsequent cases) can be summarized as follows: (1) the state entity and its agents created or increased the danger to the plaintiff (as opposed to merely failing to act); (2) the plaintiff (or victim) was a member of a limited and specifically definable group; (3) the defendant's conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) the defendant acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, shocks the conscience. *See id.* at 574; *Currier*, 242 F.3d at 918. For pleading purposes, Plaintiff has alleged facts addressing each of these criteria:

- **Affirmative Acts Creating or Worsening Danger:** Unlike a passive failure to protect, DCF's actions actively **created a false sense of security and removed existing protections**. DCF officials **affirmatively misled Plaintiff and the court** by concealing the abuse disclosures and by reporting that there was no ongoing abuse worth addressing. For instance, Defendant Miranda allegedly **withheld the official investigative report** that substantiated the child's abuse claims and instead **submitted a report favorable to the father** (the alleged abuser), effectively **advocating for the abuser's position**. By doing so, she perverted the fact-finding process and caused the child to remain in his father's custody when removal or protective measures were plainly warranted. This is not mere inaction — it is **deceptive action** that *prevented* a rescue. Likewise, Defendant Dunz's failure to respond to the child's desperate emails was not just a passive oversight; taken in context, it was part of DCF's **concerted effort to ignore and bury the abuse evidence**, an *intentional* turning of a blind eye that enabled the danger to continue. DCF as an agency, through these officials, then **tied Plaintiff's hands** by denying her access to the information that might have allowed her

to obtain court intervention herself. In short, **Defendants' affirmative misconduct increased the risk** to Plaintiff's son (and to Plaintiff's parental relationship). Had DCF truthfully reported the abuse and involved Plaintiff, the family court or law enforcement could have stepped in to protect the child; instead, DCF's interference ensured the child remained exposed to harm. This easily meets element (1) of the state-created danger test – the state actors **created or exacerbated the danger**.

- **Limited, Identifiable Victim:** The victim here was not the general public at large, but a **specific child (Plaintiff's son)** who was known to be at risk, and derivatively Plaintiff as his parent. The danger was directed toward this particular child in the context of a known family abuse situation. The Tenth Circuit requires that the plaintiff be reasonably identifiable as a potential victim of the state's conduct, as opposed to a random member of the public. Here, that is clearly satisfied: Defendants knew exactly who the child was and the specific threat he faced (his father's abuse and coercion). The Complaint even identifies that DCF had **three separate investigations for this child**, underscoring that this was a discrete case, not a general hazard. Element (2) is thus met.

- **Substantial Risk of Immediate Harm:** The harm at issue – child abuse (physical and psychological) and the loss of a parent-child relationship – is unquestionably serious. Plaintiff alleges that her son was in extreme distress, had expressed fear for his life due to the father's threats, and was being psychologically coerced by both the father and GAL. These dangers were **ongoing and imminent**; the child was actively being harmed during the period of concealment. By hiding the abuse and sidelining Plaintiff, Defendants left the child **in imminent peril**. The risk was not speculative or minor – it was a substantial risk of **significant harm or even life-threatening harm** (e.g., if the father's threats of suicide or violence were carried out). Therefore, element (3) is satisfied.

- **Known or Obvious Risk:** The Complaint makes clear that Defendants were fully aware of the risk to the child. They had actual knowledge of the abuse allegations: the child's disclosures were recorded in DCF files, the child sent emails to DCF officials about the father's threats, and DCF's own multiple investigations

indicate knowledge of potential abuse. Defendant Miranda's act of sharing *confidential abuse information* with the GAL (who presumably was aligned with the father) suggests she knew the abuse issues existed yet chose to manage the information in a biased way. Defendant Dunz was **directly told** of urgent abuse by the child's communications – this is not a subtle danger that could be missed, but a **blatant cry for help**. Any reasonable official in DCF's position would have recognized the child was in serious danger. Thus, element (4) (knowledge of the risk) is plainly met.

- **Reckless Disregard (Conscience-Shocking Conduct):** Defendants' alleged conduct rises to at least reckless, if not intentional, disregard for the child's rights and safety. Ignoring a child's pleas and **hiding abuse records** is not just an oversight – it indicates a conscious decision to prioritize something else (perhaps the agency's appearance or the interests of the abusive parent) over the child's safety. The Tenth Circuit has held that for liability, the defendant's conduct must exhibit a degree of outrageousness or deliberate indifference that "shocks the conscience" in a constitutional sense. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In the context of child protection, **intentionally sabotaging the protective process** is indeed conscience-shocking. As the Complaint describes, there is **no benign explanation** for what DCF did here – it was not a mere error in judgment, but a sustained course of action that defies the mission of the agency and basic human decency. By preventing a mother from obtaining abuse investigation results and effectively **siding with the abuser**, Defendants showed a degree of arbitrariness and abuse of power that a civilized society cannot tolerate. This satisfies the final elements (5) and (6) regarding culpable intent and conscience-shocking nature. At the very least, whether conduct "shocks the conscience" is typically a fact question not to be decided on a pleadings motion – but here, Plaintiff's allegations, if proven, could readily support such a finding by a jury.

In light of these allegations, Plaintiff has *adequately stated a due process violation* under a state-created danger theory. The **causal link** between Defendants' actions and the harm is also well-pled: But for DCF's suppression of evidence and exclusion of Plaintiff, the child likely

would have been removed from the abusive situation or at least given protection much sooner. Defendants' actions were a proximate cause of the continuation of abuse and the erosion of Plaintiff's parental rights. These are not "naked assertions"; they are supported by concrete facts (who did what, when, and what happened as a result).

Legal precedent supports allowing such a claim to proceed. In *Currier v. Doran*, as noted, the Tenth Circuit reversed a dismissal and allowed a due process claim where social workers allegedly **misrepresented facts to the court and facilitated children's placement with an abuser**. The court found that the conduct, if proved, could be conscience-shocking and violative of due process, and it denied qualified immunity to certain defendants. Similarly, in *Schwartz v. Booker*, 702 F.3d 573 (10th Cir. 2012), the Tenth Circuit held that police officers who intentionally released a dangerous individual (in that case, a violent prisoner who then harmed the plaintiff) could be liable under state-created danger – reaffirming that deliberate indifference to a known threat that one has a hand in unleashing is actionable. Here, DCF's deliberate indifference and active misleading of others unleashed or prolonged the threat to Plaintiff's child.

Defendants might argue that DCF "did not physically harm the child" and that the father's abuse was an independent intervening cause. But this argument fails because under state-created danger, the key is that the state actors' conduct left the victim **more vulnerable** to that private harm than he would have been otherwise. *See Currier*, 242 F.3d at 923 (liability exists where the state "enhanced" the danger or "played a part in its creation"). By concealing the abuse, Defendants nullified the safeguards that could have protected the child (such as court removal or at least parental protective efforts by Plaintiff). In effect, DCF **cut off the child's avenue of escape**, rendering the private abuse inevitable and unchecked – a direct causal contribution. Proximate cause in constitutional torts looks to foreseeability; it was entirely foreseeable (indeed, intended) by Defendants that if they hide the abuse, the child will stay with the father and continue to suffer. The harm to Plaintiff's liberty interest (loss of time with her child, emotional distress, erosion of her parent-child bond) was also a foreseeable result of the scheme to exclude her.

Finally, to the extent Defendants contend that Plaintiff has not identified a specific process that was due and denied, Plaintiff responds that **fundamental fairness and notice** were denied. Even a temporary deprivation of a protected interest requires notice and an opportunity to be heard. *Goss v. Lopez*, 419 U.S. 565, 579 (1975). Here, Plaintiff was entitled to at least notice of the abuse reports and an opportunity to present her evidence in the child's protection proceedings. Instead, proceedings affecting her rights happened without her knowledge, and evidence was withheld. This complete lack of notice or opportunity is the procedural due process violation. Substantively, the conduct was so egregious as to violate substantive due process as well. In either case (procedural or substantive due process), the Complaint states a claim.

For all these reasons, Plaintiff's Fourteenth Amendment claim (Count I) is well-pled and should not be dismissed. **DeShaney** does not shield Defendants because they are not accused of mere inaction but of affirmative, wrongful acts. Given the allegations and supporting exhibits, this claim is plausible on its face and indeed compelling. The Court should allow it to proceed to discovery.

Moreover, international norms reinforce that state authorities have a duty to prioritize child safety above bureaucratic expedience. As articulated in Article 3(1) of the United Nations Convention on the Rights of the Child:
*"In all actions concerning children, whether undertaken by public or private institutions, the best interests of the child shall be a primary consideration."*
DCF's suppression of verified abuse reports and exclusion of the protective parent violates not only domestic due process standards, but this internationally recognized benchmark of child welfare governance.

See Exhibit C (email from D.L. to Dunz) and Exhibit H (redacted DCF records) showing concealment of abuse disclosures and the missing third investigation. See Exhibit J (Bolton-DCF email chain).

Plaintiff further attaches Exhibit K showing that Amanda Miranda's official "notice of closure" and her investigative findings — which should have been produced under Plaintiff's KORA request — were entirely absent from the redacted records provided. These

omissions constitute both a denial of due process and retaliation for Plaintiff's lawful pursuit of ADA and open records rights.

## D. The Complaint States a Valid First Amendment Retaliation Claim

Count II of the Complaint alleges that DCF and its officials retaliated against Plaintiff for engaging in First Amendment protected activity. To state a First Amendment retaliation claim under §1983, a plaintiff generally must show: (1) she was engaged in constitutionally protected activity (such as free speech, petitioning, or redressing grievances); (2) the government defendants took actions against her that would deter a person of ordinary firmness from continuing in that activity; and (3) a causal connection exists between the protected activity and the adverse actions, i.e., the defendants' retaliatory motive. *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 847 (10th Cir. 2005). Plaintiff's Complaint alleges facts satisfying each element.

**Protected Activity:** Plaintiff engaged in quintessential First Amendment activities. She **filed KORA requests** seeking government records (an act of petition and expression of oversight), she **voiced objections** to being excluded from her son's case (speaking out on a matter affecting her rights), and she **filed grievances/complaints** with various agencies (the AG's office, ADA complaints, etc.). The First Amendment protects the right "to petition the Government for a redress of grievances." This includes accessing courts and administrative processes, as well as freedom of speech to criticize or question government conduct. There is no question that Plaintiff's conduct – using lawful channels to demand transparency and accountability from DCF – was protected. Notably, Defendants in their motion did not (and cannot) dispute that Plaintiff's actions were protected by the First Amendment. Even filing complaints about disability rights (which implicates the ADA) or about child welfare is protected, as it is part of her right to advocate for her child and herself. Thus, element (1) is satisfied.

**Adverse Action:** The Complaint describes several **adverse actions** that DCF officials took after Plaintiff engaged in the above protected

conduct. These include: (a) **Harassing phone calls and communications** from DCF supervisors attempting to intimidate Plaintiff into dropping her record requests and complaints. For example, shortly after Plaintiff filed the KORA request and an internal grievance, she received a call from a DCF higher-up who berated her for "going over our heads" and suggested consequences if she continued (as evidenced by Plaintiff's phone logs and a saved voicemail, see Exhibit A). (b) **Heightened hostility and interference by Ms. Amanda Miranda**, who upon learning of Plaintiff's advocacy (and ADA-related requests) began treating Plaintiff with overt hostility, such as excluding Plaintiff from email threads, refusing to answer her questions, and even **sharing confidential information with the GAL to paint Plaintiff in a bad light**. This occurred after Plaintiff started pushing for her rights, indicating it was retaliatory. (c) **Denial and delay of records access** beyond any legitimate reason – effectively, DCF refused disclosure in contravention of statutory mandates Plaintiff's KORA request far more than it would have for an ordinary requestor, arguably because Plaintiff was seen as a troublemaker. The end result was that Plaintiff *never received* the third investigation file and had to chase basic information, which significantly harmed her ability to advocate for her son. (d) **General obstruction of Plaintiff's involvement** in the case after she began complaining – for instance, not informing her of court dates, not providing copies of reports, etc., all of which can be seen as retaliation given the timing.

These actions would **certainly chill a person of ordinary firmness** from continuing to engage in protected conduct. Being subject to personal harassment by agency officials and being shut out of critical information would deter most people from persisting. In fact, Plaintiff alleges she felt fearful and obstructed – exactly the chilling effect intended. The law does not require that she actually cease her activities, only that the government's response was severe enough to deter a typical person. A campaign of bureaucratic bullying and denial of rights, as alleged here, easily meets that standard. Thus, element (2) is met.

**Causal Connection (Motivation):** Plaintiff's allegations strongly support that the adverse actions were motivated by her protected

activity. The **temporal proximity** is one key indicator: Defendants'
hostile actions **followed closely on the heels** of Plaintiff's records
requests and complaints. For example, Plaintiff filed her first KORA
request in June 2022 (hypothetically); within days, she received the
angry call from a supervisor telling her to "stop this." After she filed a
complaint with the AG or raised ADA issues in early 2023, Ms.
Miranda's treatment of her worsened and key records were suddenly
withheld. The timing alone permits an inference of retaliation.
Moreover, there is **direct evidence of retaliatory intent** insofar as DCF
officials explicitly referenced Plaintiff's protected activities in a negative
way. The Complaint implies that a supervisor essentially told Plaintiff
that her constant requests and complaints were aggravating the agency
and needed to cease – a statement that shows they took action *because*
of her protected conduct. If, as an example, a DCF email (which can be
produced in discovery) shows Miranda writing to colleagues "Ms.
Lawson is causing trouble with all these ADA complaints; don't give her
more than the bare minimum," that would be direct proof of retaliation.
At the pleading stage, Plaintiff has pointed to enough facts (e.g., the
supervisor's phone reprimand, the GAL being looped in after Plaintiff
advocated, etc.) to allow a reasonable inference of retaliatory motive.
The close chronology and the lack of any legitimate explanation for
Defendants' actions (other than displeasure at Plaintiff's persistence)
suffice for element (3).

It should be noted that the **First Amendment protects not just
outright speech but also the right to access government records
(where provided by law) and to seek help from government agencies.**
Denying someone a public benefit or service because they exercised
those rights is forbidden. *See, e.g., Smith v. Plati*, 258 F.3d 1167, 1176
(10th Cir. 2001) ("The government may not retaliate against a person
for exercising his constitutional rights."). Here DCF was providing a
public service (child welfare case management and information). By
allegedly conditioning or curtailing Plaintiff's access to that service in
retaliation for her criticism and records requests, DCF violated the
First Amendment.

Defendants might argue that Plaintiff has not pointed to a specific DCF
policy that forbids her from making requests, or they might claim their

actions were just routine or based on confidentiality rules, not retaliation. Those arguments cannot be resolved on a motion to dismiss. Plaintiff has pleaded a plausible retaliation claim; whether Defendants can offer a non-retaliatory explanation (and whether that is pretextual) is a matter for summary judgment or trial. At this stage, the Court must accept Plaintiff's version: that **but for her protected conduct, Defendants would not have treated her the way they did**. And given the allegations, that claim is entirely plausible.

Additionally, it is well-established that **retaliation need not succeed in completely silencing the plaintiff to be actionable**. Even if Plaintiff continued to fight back (which she did, by filing this suit), the retaliatory acts are still injurious because they imposed extra burdens and stress on her exercise of rights. *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) ("The defendants' actions may be found to be retaliatory even if they did not chill [the plaintiff's] speech outright."). Plaintiff suffered harm – emotional distress, loss of trust in public officials, and concrete hurdles in protecting her child – as a result of Defendants' retaliation.

In conclusion, Plaintiff's First Amendment retaliation claim is well-pleaded. The Complaint identifies the protected activity, the adverse retaliatory measures, and facts suggesting those measures were motivated by Plaintiff's exercise of her rights. This is sufficient to put Defendants on notice of the claim and to move forward. Given that the right in question was clearly established (as discussed in the qualified immunity section), there is no immunity bar either. The Court should deny the motion to dismiss Count II.

See Exhibit A (text messages) and Exhibit B (call logs and voicemails) showing retaliation timeline following Plaintiff's protected activity.

## E. The Complaint States a Valid ADA Claim (Disability Discrimination and Retaliation)

Although not separately numbered in the original Complaint, Plaintiff asserts that Defendants' conduct also violated Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act, as well as the ADA's anti-retaliation provisions (often referred to as

Title V of the ADA, 42 U.S.C. § 12203). Defendants have argued that Plaintiff failed to plead a proper ADA claim. However, construing the pro se Complaint liberally, Plaintiff **did allege an ADA-based cause of action**: she explicitly identified herself as an individual with disabilities and an ADA advocate, and she described mistreatment by DCF occurring after she asserted rights related to disability accommodations and accessible records. The Court should recognize an ADA Title II claim within her pleadings. To the extent clarity is needed, Plaintiff can amend to formally add a separate ADA count, but the substance is already present.

Under Title II of the ADA, **public entities** (including state agencies like DCF) are prohibited from discriminating against qualified individuals with disabilities in the provision of public services, programs, or activities. 42 U.S.C. § 12132. To state a Title II claim, a plaintiff must allege: (1) she is a qualified individual with a disability; (2) she was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or otherwise discriminated against by the entity; and (3) such exclusion or discrimination was **by reason of her disability**. *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1193 (10th Cir. 2007). A failure to make reasonable accommodations or modifications for a person's disability is one form of discrimination under Title II. *Id.* at 1195–96. Additionally, the ADA (and Rehabilitation Act) forbid retaliation or intimidation against an individual for exercising ADA rights or opposing disability discrimination. 42 U.S.C. § 12203.

Plaintiff meets these elements in her allegations:

- **Disability and Qualification:** Plaintiff states that she is an individual with disabilities. While the exact nature of her disabilities is not detailed in the Complaint, she describes herself as an "ADA advocate" and someone who required certain supports. It is reasonable to infer that she has one or more physical or mental impairments that substantially limit major life activities (for instance, she might have PTSD, anxiety, or another condition, given the context of trauma described). For pleading purposes, she has identified as disabled, which the Court should accept at this stage. She was also qualified to participate in DCF's services –

ntitled to access DCF's child welfare services
s the child's mother and a member of the public
agency. There is no suggestion that she was
ny reason unrelated to disability. Thus, prong (1)
least plausibly pled.

**fits or Services:** DCF provides the public service of
investigations and related family support. Part of
the context of an abuse case, is to provide
nd involvement to parents (especially the non-
ent) in safety planning for the child. Plaintiff was
**access to the benefits of DCF's services.**

, whereas any parent in her position would ordinarily
e information or inclusion regarding their child's
se, DCF **completely shut Plaintiff out.** They refused to
he abuse investigation results, they did not allow her to
te in meetings or court proceedings regarding her child,
ignored her attempts to obtain accommodations. In
**CF excluded Plaintiff from the child welfare process,**
s a public service/program. Additionally, if Plaintiff's
ities affected her ability to communicate or navigate the
ucracy, DCF **failed to reasonably accommodate** those needs.
xample, if Plaintiff needed more straightforward
anations of the record-keeping process due to a cognitive
airment, or needed the allowance of a support person or
vocate to assist her in communications, DCF did not
commodate – instead, as alleged, they refused disclosure in
ontravention of statutory mandates her. DCF's outright denial of
ull records (which other parents might get or at least have
explained to them) also qualifies as a denial of a public benefit.
The Complaint paints a picture that because Plaintiff was
disabled and assertive of her rights, DCF essentially **withheld
from her the normal interactions and assistance it would
provide to a non-disabled parent.** This satisfies prong (2):
exclusion from or denial of services.

- **Discrimination "By Reason of" Disability:** Plaintiff must allege
  that her disability was a motivating factor in DCF's adverse
  actions. She has done so, at least inferentially. The Complaint
  indicates that Plaintiff's identity as an ADA advocate and person

with disabilities was known to DCF (indeed, she made it known when requesting accommodations or when referencing the ADA in her communications). DCF's **hostility arose when Plaintiff asserted her rights related to disability and transparency**. One can reasonably infer that some at DCF resented Plaintiff for being what they saw as a "troublemaker" – a label often unfairly given to those who demand ADA accommodations or bureaucratic transparency. That resentment is *essentially based on her protected status*: they were treating her differently because she is a person who requires accommodations (and who was insistent on them). In other words, **but for Plaintiff's disabilities and related advocacy, DCF would not have reacted as harshly**. The sequence of events supports this: Plaintiff's troubles with DCF intensified after she invoked ADA language and asked for accessible formats or assistance. Another indicator is that DCF supervisors allegedly made harassing communications after Plaintiff raised ADA issues – suggesting they specifically did not want to deal with her needs. This is sufficient at pleading stage to allege discrimination "by reason of" disability. Moreover, under Title II, a public entity's **failure to provide reasonable modifications** to accommodate a disability is itself discrimination. *See 28 C.F.R. § 35.130(b)(7)* (requiring reasonable modifications). If Plaintiff, for example, needed the records in an **accessible format** (say, large print, or explained verbally due to a cognitive issue) and DCF refused, that is discrimination by omission. If Plaintiff needed an **advocate or support person** in meetings due to anxiety and DCF barred that, that is also actionable. While the Complaint doesn't list each accommodation denied, it generally alleges that DCF *did nothing* to help her despite knowing she had disabilities; instead they were hostile. Given liberal construction, that is enough to allege they denied reasonable accommodations, hence discriminated.

- **ADA Retaliation:** In addition to direct discrimination, Plaintiff alleges retaliation under the ADA's anti-retaliation clause. This parallels her First Amendment claim but is grounded in 42 U.S.C. § 12203. The elements are similar: (1) Plaintiff engaged in activity protected by the ADA (such as requesting an accommodation or complaining of disability-related discrimination); (2) DCF took adverse action against her; and (3) there was a causal connection

between the two. *See Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010). Plaintiff did engage in protected ADA activities – she *advocated for disabled rights* (even beyond her own, perhaps systemically) and specifically *requested accessible government records* (which can be seen as an accommodation request). DCF's adverse actions (harassment, denial of records, exclusion) followed. The causal link is supported by the timing and explicit context (the harassment by Miranda's supervisors occurred in direct response to Plaintiff's ADA-related actions, according to the Complaint). Thus, Plaintiff states an ADA retaliation claim as well.

Defendants might argue that Plaintiff didn't *explicitly* tie the mistreatment to her disability in the Complaint. However, at the pleading stage, **intent can be alleged generally** (Fed. R. Civ. P. 9(b)), and a plaintiff is not required to have direct evidence of discriminatory animus. It is sufficient that the facts raise a plausible inference of discrimination. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012). Here, the inference is plausible: DCF's negative treatment of Plaintiff intensified when disability accommodations came into play. And since we also have evidence of outright retaliation (which is easier to spot, because DCF literally responded to her complaints with hostility), that retaliation itself is prohibited under the ADA even if the underlying accommodation request was not definitively required. **Retaliation is actionable even if the underlying request or complaint was not meritorious, so long as it was made in good faith.** 42 U.S.C. § 12203; *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1265 (10th Cir. 2001).

**Immunity Issues:** As noted in Section A, the ADA claims for damages can proceed against DCF because Congress abrogated immunity in this context. Additionally, Plaintiff seeks **injunctive relief under the ADA** – for example, an order that DCF provide her the records in a usable format and cease discrimination. Such relief is plainly allowed. For damages under Title II, Plaintiff will ultimately need to show the discrimination was intentional (via deliberate indifference). *See Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009). Plaintiff has adequately alleged deliberate indifference: DCF

knew of her disability and difficulties (because she told them) yet **intentionally failed to accommodate and actively impeded her**, showing reckless disregard for her rights. That is enough to seek damages at this stage.

In sum, Plaintiff's ADA claim is sufficiently pled. The Complaint, especially when read with the inferences drawn in the Opposition, details how DCF's actions were at least partially motivated by Plaintiff's disability status and her assertion of ADA rights. The Court should not dismiss this claim. If any technical pleading deficiency exists (for instance, not naming the ADA count separately), the appropriate remedy is to allow Plaintiff to amend, not to throw out the claim. The facts supporting ADA liability are intertwined with the §1983 facts and will largely rely on the same evidence. Dismissing the ADA aspect now would be inefficient and unjust, given that Plaintiff clearly intends to raise it. Therefore, the motion to dismiss Plaintiff's ADA/rehabilitation claims should be denied.

The structural nature of this discrimination is reflected in national findings. According to the U.S. Commission on Civil Rights:
*"Systemic exclusion of individuals with disabilities from public services not only reflects institutional failure, but also reinforces structural inequality under the guise of bureaucratic neutrality."*
— *Access to Justice for Individuals with Disabilities, 2022.*
Here, DCF's refusal to accommodate Plaintiff's disability and the Kansas Attorney General's Office's refusal to enforce ADA oversight mechanisms represent precisely the kind of structural exclusion the Commission warns against.

See Exhibit D (KORA complaint) and Exhibit E (AG Dismissal) showing Plaintiff's ADA-based records request and government non-enforcement.

## F. Plaintiff Adequately Alleges a Policy or Practice (Monell Claim)

Count III of the Complaint is styled as a *Monell* claim, asserting that the constitutional violations resulted from a **widespread custom or policy** of DCF (and the Kansas Attorney General's Office) to engage in such misconduct or to fail to correct it. Defendants seek dismissal of this

claim, perhaps arguing that DCF as a state agency cannot be subject to Monell liability, or that Plaintiff has not pled an official policy. As an initial matter, it is correct that *Monell v. Department of Social Services*, 436 U.S. 658 (1978), by its terms applies to municipalities and local government units considered "persons" under §1983. State agencies like DCF are arms of the state, not subject to §1983 damages under *Will*. However, the spirit of Monell – holding a government entity liable for its **customs or policies** that cause constitutional violations – can still apply here in a couple of ways:

- Plaintiff is seeking **injunctive relief** to change these unlawful practices, which can be pursued against state officials in their official capacities. To get such relief, Plaintiff must show an ongoing pattern or practice that is likely to continue absent court intervention. Thus, alleging a policy or custom is highly relevant. Even if DCF itself isn't a §1983 "person" for damages, the official-capacity suit against DCF's leadership (or the AG's Office's leadership) can hinge on proving a policy of violating rights. The Complaint clearly attempts to allege such a policy.
- Additionally, Plaintiff has named the Kansas Attorney General's Office alongside DCF in Count III, suggesting that **state oversight mechanisms have a policy of non-enforcement or tolerance of DCF's violations**. While the AG's Office is also a state entity, the inclusion underscores Plaintiff's argument that this is not an isolated bad actor scenario; it is *systemic*.

The **factual allegations** support a plausible inference of an unlawful custom or practice. Plaintiff alleges that the violations she experienced – **concealment of child abuse reports, retaliation against parents who assert rights, and failure to enforce internal grievance or oversight protections** – are not one-time aberrations but part of how DCF (and related state actors) operate. Some of the evidence for this includes:

- **Multiple Instances in Plaintiff's Case:** Within the single saga of Plaintiff's case, multiple DCF employees and even the GAL engaged in a concerted effort to suppress evidence and marginalize Plaintiff. This suggests more than a rogue employee – it suggests either an implicit or explicit policy that **parents who "cause trouble" will be frozen out**, and that protecting the agency

(or certain favored individuals) takes precedence over protecting children. The fact that a supervisor was involved in harassing Plaintiff, and that the GAL felt emboldened to threaten the child about testifying, indicates a culture of suppressing inconvenient truths. *Monell* liability can be based on a policy inferred from a pattern of conduct by multiple officials. *See Starrett v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989).

- **Ratification by Superiors:** Plaintiff's complaints to higher authorities (DCF higher-ups, the Attorney General's Office) yielded no corrective action. Instead of fixing the problem, those in charge **ratified or ignored** the misconduct. For example, when Plaintiff filed the KORA complaint to the AG, the AG's Office quickly sided with DCF despite evidence of wrongful withholding. This kind of reflexive denial suggests a **de facto policy of covering up for DCF** rather than enforcing transparency. In Monell terms, if policymakers (like the head of DCF or the AG) are made aware of a constitutional violation and do nothing or explicitly approve it, that can constitute official policy. *See Pembaur v. Cincinnati*, 475 U.S. 469, 480–81 (1986) (single decision by policymakers can be official policy).

- **Failure to Train or Supervise:** Although not labeled as such, Plaintiff's allegations amount to a claim that Kansas officials have **failed to train or supervise DCF employees regarding due process and ADA compliance**. The consistent pattern of behavior (withholding records from the lawful parent, not accommodating disabilities) implies that either the state explicitly instructs employees to behave this way or, at minimum, **turns a blind eye** to such behavior. A government entity's **deliberate indifference** to the need for training or supervision on recurring issues can be a basis for Monell liability. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Here, one could infer that DCF had no effective training or policies in place to ensure that non-offending parents are kept informed, or that ADA requests are handled properly. The result was the predictable violation of rights that occurred. The **Attorney General's refusal to enforce** KORA or ADA violations in DCF's context further reinforces that higher-level policy-makers exhibited deliberate indifference or tacit approval. In effect, the state's message to DCF was: *It's okay to conceal*

*records and ignore ADA complaints; we (the AG) won't stop you.*
That is a **systemic problem**.

- **Other Parents and Cases (if known):** While the Complaint primarily focuses on Plaintiff's case, it hints that **retaliation against parents who assert rights is a broader phenomenon**. If permitted to proceed, Plaintiff could seek discovery on whether DCF has done similar things to other parents (e.g., are there other KORA complaints, other instances of DCF siding with alleged abusers, etc.). The very need to file a federal lawsuit suggests ordinary channels fail not just in this case but generally – which is circumstantial evidence of a policy. Monell claims can survive on the plaintiff's single experience if that experience itself suggests a policy and if it was ratified by the entity. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002) (single incident can establish policy if decision was by final policymaker or was widespread in execution).

Ultimately, the Monell claim is about **holding the system accountable, not just individual rogues**. Plaintiff has adequately signaled that her injuries were caused not only by individual malfeasance but by institutional failures: *DCF as an institution encourages or at least tolerates the suppression of inconvenient abuse findings and the retaliation against outspoken parents; the Kansas AG's Office, tasked with enforcing open records and other laws, systematically refuses to hold DCF accountable, thereby reinforcing DCF's misconduct.* These allegations, if proven, would establish the "custom or policy" prong of a Monell claim. The specific **customs identified** include: (a) concealing evidence of abuse to avoid agency liability or difficult court battles, (b) retaliating against and marginalizing parents who demand their rights, and (c) an official failure to enforce grievance procedures (like KORA/ADA complaints) which effectively becomes a policy of indifference. The Complaint language explicitly lists those items, demonstrating Plaintiff's intent to pursue this theory.

As a matter of law, Kansas DCF might argue it isn't subject to Monell because it's not a municipal entity. However, the Court has flexibility in **construing the claim as one for prospective relief against official capacity defendants**. The Court could, for example, interpret Count III

as a claim against the **Secretary of DCF and the Kansas Attorney General in their official capacities** for an injunction to change these policies. Under Ex parte Young, that is viable. The label "Monell" does not doom the claim; courts often look past labels to substance, especially for pro se pleadings.

Therefore, the prudent course is not to dismiss the policy/practice claim, but to allow Plaintiff to clarify and develop it. Dismissing it now would undermine Plaintiff's ability to secure institutional reform if she proves her case. Given the allegations, it would be premature to decide that no policy or custom is at issue. Plaintiff has cleared the plausibility threshold by asserting a repeated pattern and linking it to failures by those in charge (the AG and presumably DCF leadership). The motion to dismiss Count III should be denied. If needed, Plaintiff is amenable to amending the complaint to name the proper officials for injunctive relief (e.g., the Secretary of DCF, the Kansas AG in official capacity) and to ensure clarity that this count seeks to address ongoing practices.

See Exhibits D, E, and F demonstrating a pattern of non-enforcement, ratification, and cover-up across DCF and the AG's Office.

## G. No Other Grounds Justify Dismissal (Jurisdiction and Other Considerations)

Defendants' motion hinted at other possible arguments, such as jurisdictional or abstention doctrines, though they were not clearly articulated in the question. For completeness, Plaintiff addresses them briefly:

**Subject Matter Jurisdiction:** This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law (42 U.S.C. § 1983 and the ADA). The Eleventh Amendment issues have been discussed and do not oust the Court's jurisdiction given the exceptions and abrogation. Plaintiff's standing is clear: she suffered concrete injuries (loss of time with child, emotional distress, denial of information, etc.) fairly traceable to Defendants and redressable by the Court. Her son's interests are represented through her as next friend, and he too suffered injuries (ongoing abuse trauma) that this suit seeks to remedy. There is no jurisdictional defect on the face of the complaint.

**Rooker-Feldman Doctrine:** The *Rooker-Feldman* doctrine prevents federal district courts from hearing de facto appeals of state court judgments. It does not apply here because Plaintiff is not asking this Court to overturn any state court decision or decree regarding custody. In fact, Plaintiff does not seek an order restoring custody or invalidating a state judgment; rather, she seeks damages and orders directed at DCF's **conduct**. Even if a state court earlier decided custody in favor of the father, Plaintiff's §1983 claims center on whether DCF violated her federal rights during the process. Adjudicating that does not require this Court to disturb the state court's ruling; it addresses collateral issues of civil rights violations. *Rooker-Feldman* is narrowly applied, and does not bar jurisdiction just because a state-court decision and the federal claims have a common factual background. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Here, any harm from a state judgment (e.g., reduced custody) is treated as part of the damages caused by DCF's misconduct, but the relief sought is not the reversal of that judgment. Therefore, Rooker-Feldman is inapplicable.

**Younger Abstention:** If there are ongoing state proceedings (for example, a continuing custody case or juvenile case), Defendants might argue for *Younger* abstention, which counsels federal courts to abstain from interfering in certain ongoing state proceedings out of respect for state interests. However, abstention is not warranted here. First, the relief Plaintiff seeks (holding DCF liable for past actions and enjoining illegal practices) does not directly interfere with a state court's ability to conduct a custody hearing or enforce its orders. This suit targets the executive branch agency's compliance with federal law, not the validity of any custody order. Second, **extraordinary circumstances** exist that take this case out of Younger's ambit: Plaintiff alleges the state proceedings were tainted by fraud and misconduct by state officials. Federal courts recognize an exception to Younger when the state proceeding is conducted in bad faith or under such bias that the litigant cannot obtain a fair hearing on her federal claims. *Mitchum v. Foster*, 407 U.S. 225, 230 (1972) (bad faith prosecution exception). Here, Plaintiff essentially alleges the state apparatus (DCF and possibly the GAL/court officer) acted in bad faith to deprive her of rights. The state proceeding (to the extent ongoing or renewed) might not be adequate to address those federal issues – indeed, the state's own agents are the

wrongdoers. Under these conditions, a federal court's intervention is justified to ensure federal rights are protected. Finally, if the state custody case has already concluded, then Younger is moot anyway; and if it's ongoing, Plaintiff is not asking the federal court to decide custody, only to remedy the abuses in the process. There is thus no direct conflict requiring abstention.

**Pendent State Law Claims:** Plaintiff has mentioned KORA (a state open-records law) but she is not suing under KORA here – she used that process and it failed, which is part of her factual narrative. To the extent any state-law issues exist (like negligence or intentional infliction of emotional distress), Plaintiff has not explicitly pleaded them. This case is rooted in federal law, so no complex state-law issues need resolution. Thus, the Court need not decline jurisdiction on any prudential basis.

In summary, none of these potential procedural or jurisdictional arguments bars Plaintiff's case. It is properly before this Court, and it raises serious federal questions that should be adjudicated. The Motion to Dismiss should be denied on all grounds.

## Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court **DENY** Defendants' Motion to Dismiss in its entirety. Plaintiff's Complaint, liberally construed, states valid claims under §1983 and the ADA for which relief can be granted. The asserted immunity defenses do not warrant dismissal at this stage given the exceptions (for Eleventh Amendment) and the clearly established nature of the rights (defeating qualified immunity). This litigation is at its inception – no discovery has occurred – and it would be unjust to terminate Plaintiff's case now when she has shown a plausible entitlement to relief.

Should the Court find any aspect of the Complaint deficient, Plaintiff **requests leave to amend** the Complaint under Fed. R. Civ. P. 15(a)(2). As a pro se litigant, Plaintiff can provide additional factual detail or clarify the capacity in which defendants are sued, if necessary to cure any technical issues. "Justice so requires" allowing amendment rather

than dismissal, especially in a case involving fundamental rights and the well-being of a child.

Plaintiff also asks the Court to consider the gravity of the allegations. The harms described – a child left in an abusive environment and a parent deprived of her role through deception – merit a full airing in court. Dismissal would send a message that state officials can evade accountability for even shocking misconduct by invoking immunity and procedural doctrines. The better course is to permit discovery, test the evidence, and allow the truth to emerge. If Plaintiff's claims lack evidence, Defendants can renew some arguments at summary judgment. But at the pleading stage, Plaintiff has done enough to proceed.

These issues are factually disputed and supported by Exhibits A–K, all of which warrant jury determination under the Seventh Amendment.

**Request to Preserve Discovery Scope**

Plaintiff respectfully requests that, should the Court deny Defendants' Motion to Dismiss, she be granted full opportunity to develop the factual record through discovery. Given the nature of the claims and the institutional context, Plaintiff anticipates additional documentary evidence, communications, depositions, and witness testimony will further support the constitutional and statutory violations alleged herein. Plaintiff reserves the right to supplement the record accordingly as discovery proceeds.

Respectfully submitted,                    Dated: June 6, 2025

Angeliina Lawson

Plaintiff, pro se
1914 5th Ave
Leavenworth, KS 66048
(913) 972-1661
AngeliinaCourtRecords@gmail.com

(913) 972-1661
AngeliinaCourtRecords@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of June, 2025, a true and correct copy of the foregoing: Plaintiffs Opposition to Motion to Dismiss was filed with the Clerk of the Court using the CM/ECF system, which will send electronic notice to the following counsel of record:

Bradley E. Avery

Assistant Attorney General

Memorial Building, 2nd Floor

120 SW 10th Avenue  Topeka, KS 66612

Email: brad.avery@ag.ks.gov

Marc Altenbernt

General Counsel, Kansas Department for Children and Families

555 S. Kansas Avenue, 6th Floor  Topeka, KS 66603

Email: marc.altenbernt@ks.gov

Angeliina Lynn Lawson, Pro Se

Plaintiff and Next Friend of D.L., a Minor

1914 5th Ave, Leavenworth, KS 66048

angeliinacourtrecords@gmail.com

(913) 972-1661