IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

ANGELIINA LYNN LAWSON,

Plaintiff, Pro Se and Next Friend to Minor D.L.,

ADA-Protected Litigant and Advocate,

v.

KS DCF, et al.,

Defendants.

Case No. 2:25-cv-02171

DISQUALIFICATION OF JUDGES

ARTICLE III COLLAPSE NOTICE

PRESERVATION FOR U.S. COURT OF FEDERAL CLAIMS

COURT-ORDERED FIRST AMENDED COMPLAINT UNDER DURESS THREATS OF

FINANICAL PUNISHMENT OF AN IFP STATUS LITIGANT

*Preserved Under Protest and Duress in Compliance with Dkt. 73 and Rule 15(a)(2)*

*Trial by Jury Demanded | ADA Retaliation | Fraud Upon the Court | Rule 60(d)(3) Preserved | Rule 27 Reserved | Appeal Rights Not Waived*

This amended complaint is submitted under judicial coercion, financial intimidation, and

structural due process deprivation, **in** protest of unconstitutional restrictions imposed by this

Court's November 24, 2025 Order (Dkt. 73). That order directed Plaintiff an indigent, disabled, pro se litigant to abandon her claims against defaulted state actors **and** forfeit the protected interests of her ADA-covered minor son, D.L. The Court further threatened dismissal and sanctions if Plaintiff did not comply despite her documented disabilities and her efforts to present material factual disputes for jury resolution.

Plaintiff asserts that these directives violate her rights under Mathews v. Eldridge, 424 U.S. 319 (1976) (procedural due process balancing test), and amount to a form of constructive suppression of federally protected civil rights claims under the ADA, 42 U.S.C. § 12203(b). The conditions imposed seek to "gut" the complaint of its core claims through coercive amendment, thereby insulating misconduct by state employees and suppressing evidence of fraud upon the court contrary to the Constitution's guarantees of access, redress, and adversarial process.

Plaintiff asserts a deprivation of her Seventh Amendment right to a jury trial on material factual disputes. She files this pleading under protest, expressly preserving her rights under:

• Fed. R. Civ. P. 15(a)(2) – Amendment by leave of court under duress;

• Fed. R. Civ. P. 60(d)(3) – Relief from judgment due to fraud on the court;

• Fed. R. Civ. P. 27 – Pre-suit preservation of evidence;

• Fed. R. Civ. P. 17(c)(2) – Next Friend status for disabled minor D.L.;

• 28 U.S.C. § 1291 – Preservation of appellate rights;

• 28 U.S.C. §§ 2675, 1491 – Tucker Act notice of constitutional injury and damages;

• U.S. Const. Amends. I, V, and XIV – Access to justice, due process, equal protection;

• 42 U.S.C. §§ 12132, 12203(b) – ADA Title II and retaliation claims.

Plaintiff further alleges that Judge John W. Broomes has effectively joined the defense, coordinating de facto with the defaulted Kansas Attorney General's Office and DCF counsel to obstruct discovery, override procedural defaults, suppress jury access, and silence ADA-protected grievances.

Plaintiff preserves all prior filings, motions, exhibits, defaults, interlocutory appeals, and pending Rule 27 and Rule 60 matters, and files this complaint without waiving any claims or defenses preserved in the original or amended pleadings.

Plaintiff also holds a signed and notarized Power of Attorney (POA), executed October 23, 2025, designating her as the ADA advocate and safety representative for her minor son, D.L. This POA affirms her lawful authority under HIPAA, FERPA, ADA Title II, and K.S.A. 60-3101 et seq. to act as Next Friend for all medical, educational, ADA advocate, and legal matters relating to D.L.'s disability and safety.

Plaintiff further states that material facts are in dispute, and these cannot be decided at the pleading stage without discovery and trial. Under *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986), and *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959), issues of credibility and fact must be submitted to a jury, not summarily dismissed by judicial fiat.

Clarification of Claims and Jurisdiction: Plaintiff has never sought to litigate custody, alimony, child support or divorce proceedings in federal court. This case arises from system failure, ADA retaliation, falsified or destruction of government records, whistleblower suppression, and due process violations within a federally funded state agency (DCF).

The U.S. Constitution, ADA Title II, KORA, and federal whistleblower protections form the basis of jurisdiction. The misconduct alleged includes inter-agency record falsification or destruction, obstruction of grievances, unlawful KIDS case reclassification, forged documents used in judicial proceedings, safety reports from a child directly were ignored, and suppression of mandated reports none of which are within the exclusive purview of family court.

## PRELIMINARY STATEMENT

1. Specifically, Defendants Amanda Miranda and Heather Dunz engaged in evidence concealment, coercive isolation of a child witness, retaliation, and the exclusion of Plaintiff from matters involving the safety and welfare of her son. Plaintiff's custodial rights were actively sabotaged in coordination with court actors while Plaintiff was deprived of any meaningful opportunity to respond.

2. Plaintiff seeks monetary damages, declaratory relief, injunctive relief, and other remedies to prevent future constitutional violations against similarly situated parents and children.

3. This Court-ordered amendment is not intended to waive or supersede any claims, allegations, or parties named in the original Complaint (Dkt. 1), and Plaintiff preserves all such matters for interlocutory appeal or subsequent motion under Rule 54(b).

## JURISDICTION AND VENUE

This Court has subject-matter jurisdiction under:

- 28 U.S.C. § 1331 – Federal question jurisdiction over civil rights and ADA claims;

- 42 U.S.C. § 12132 et seq. – Title II of the Americans with Disabilities Act;

- 42 U.S.C. § 12203(b) – ADA retaliation for advocacy and accommodation requests;

- 42 U.S.C. § 1983 – Civil rights deprivation under color of law;

- 28 U.S.C. § 1343(a)(3) – Redress for deprivation of constitutional rights under federal law;

- 28 U.S.C. §§ 2201 & 2202 – Declaratory and injunctive relief;

- 28 U.S.C. § 1651 – All Writs Act, preserving procedural and jurisdictional access;

- U.S. Const. amends. I, V, and XIV – Access to courts, due process, and equal protection;

- U.S. Const. art. VI, cl. 2 (Supremacy Clause) – Preemption of state actors obstructing federal rights.

Venue is proper in the District of Kansas under 28 U.S.C. § 1391(b) because all alleged events and omissions by Defendants Amanda Miranda and Heather Dunz, in their personal and official capacities, occurred within this judicial district, where both defendants are employed and operate.

## PARTIES

Plaintiff: Angeliina L. Lawson is a pro se litigant, a federally protected individual under the Americans with Disabilities Act (ADA), and the duly authorized Next Friend and ADA advocate for her disabled minor son, D.L. She brings this action both on her own behalf and in her representative capacity under Federal Rule of Civil Procedure 17(c)(2), which authorizes a "next friend" to sue on behalf of a minor who lacks the capacity to litigate. Plaintiff's standing is further established by a notarized Power of Attorney dated October 23, 2025, executed in compliance with Kansas law and accepted by D.L.'s treating medical providers.

D.L. is 15 years old and has formally diagnosed conditions medically documented including anxiety disorder and psychological trauma, which substantially limit major life activities such as communication, memory, learning, and emotional regulation placing him squarely within the definition of "disabled individual" under 42 U.S.C. § 12102(1) and 28 C.F.R. § 35.108 (ADA Title II implementing regulations). These impairments also qualify D.L. for special protections in educational, medical, and legal contexts.

Plaintiff's authority to act as Next Friend is explicitly endorsed by federal law, which provides that when a minor lacks a duly appointed representative, "the court must appoint an attorney to protect a minor who is unrepresented." See Fed. R. Civ. P. 17(c)(2). Here, Plaintiff has made that declaration under penalty of perjury and submitted a formal POA authorizing her advocacy. In addition, Kansas law similarly recognizes a parent's right to pursue protection or legal action on behalf of their minor child in need of care. See K.S.A. 60-217 and K.S.A. 38-2203.

Plaintiff also acts as D.L.'s ADA advocate, empowered under 42 U.S.C. § 12203(b) to assert and defend protected rights without retaliation. Her ADA role includes seeking reasonable accommodations in communications, securing therapeutic access, challenging discriminatory treatment, and preventing unlawful exclusion of D.L. from services based on his disability.

Medical documentation will further demonstrate D.L.'s disabilities and Plaintiff's power of attorney to advocate for his needs. Plaintiff brings this action on her own behalf and in protected advocacy for her son, both of whom have been unlawfully denied reasonable accommodations, access to federal rights, due process, and protection from discrimination, coercion, system failures and retaliation by state actors under color of law. The District of Kansas's local rules underscore that pro se litigants are entitled to meaningful access and fair procedures; for

example, the rules require cooperation in motion practice and discovery with unrepresented

parties in civil rights cases to ensure fairness. Plaintiff will invoke these protections as necessary

so that her disability and pro se status do not impede full and equal participation in this litigation.

Plaintiff's claims arise from a pattern of violations implicating ADA Title II, the U.S.

Constitution, and the Supremacy Clause, and seek redress for continuing injury to federally

guaranteed civil rights.

Defendants: Amanda Miranda, DCF case worker, sued in her individual and official capacity.

DCF social worker or investigator in Leavenworth County, Kansas. As detailed herein, Ms.

Miranda was responsible for intake and investigation of multiple abuse reports concerning D.L.,

and for communicating findings. Plaintiff alleges that Ms. Miranda violated DCF's internal

policies and Plaintiff's rights by improperly downgrading or dismissing abuse reports, disclosing

confidential case information to unauthorized individuals, and failing to accommodate

disabilities of D.L. and herself during the multiple investigations reported by mandated reporters.

Heather Dunz, DCF case worker, sued in her individual and official capacity. DCF social worker

or investigator in Johnson County, Kansas. Ms. Dunz was assigned to a later abuse report by the

medical doctor regarding physical abuse reports directly from D.L. and, as described below,

failed to properly investigate. Plaintiff alleges Ms. Dunz likewise violated DCF policy and

Plaintiff's rights by conducting only a cursory inquiry, ignoring documented reports of safety

threats, and leaving the child in an unsafe environment.

Plaintiff reserves the right to amend this complaint to name additional parties as evidence

emerges during discovery, including individuals and entities complicit in the ADA retaliation,

spoliation of public records, or coordination to obstruct federal access to justice in violation of 42 U.S.C. § 1985(2), Rule 60(d)(3), and the Supremacy Clause.

Other Persons: Various other individuals are involved in the facts (including D.L.'s father, a guardian ad litem (GAL), and DCF supervisors), but they are not named as defendants in this complaint. Wherever relevant, their actions are described to illustrate the context of Defendants' conduct.

## STATEMENT OF FACTS AND SYSTEM FAILURES

A. DCF's Duty to Investigate and Protect. Kansas law charges DCF with the duty to receive and investigate reports of child abuse or neglect to determine whether the report is valid and what action is required to protect the child. DCF's own Prevention and Protection Services Policy Manual (PPM) emphasizes that an investigation is the initial phase of assessment for abuse/neglect reports, in which facts must be obtained and evidence gathered in order to reach a conclusion on the validity of the report and decide what actions, if any, are needed for the child's safety. In short, DCF is obligated to conduct a thorough and good-faith inquiry into abuse allegations, and to take appropriate measures to keep the child safe, consistent with the law K.S.A. 38-2226 and internal policy.

B. First Abuse Report – Mishandled and Reclassified. the summer or early fall of 2024, Plaintiff's minor son D.L. made his first outcry of abuse during a crisis episode. While speaking with a mandated reporter through a crisis hotline, D.L. became visibly emotional, collapsed into panic, and expressed fear of his father, Jonathan Brent Lawson. As required by law, the crisis

staff immediately filed a report with the Kansas Department for Children and Families (DCF), citing allegations of child pornography, emotional abuse, neglect, and potential sexual misconduct.

These allegations triggered mandatory reporting protocols under K.S.A. § 38-2223 and DCF's own policy manual (PPM § 10200 and § 2100, which require full investigations, not assessments, in such cases).

However, Defendant Amanda Miranda unilaterally later and retroactively reclassified the report as a mere "Family Assessment", rather than initiating a formal abuse/neglect investigation, as required by DCF policy. This procedural change eliminated the obligation to issue formal findings or protective action letters effectively erasing the record and preventing Plaintiff from being notified or involved. This initial breach of protocol created a pattern of misconduct and retaliation, beginning with a documented safety outcry that was obstructed, recoded, and then denied when later sought under Kansas Open Records Act (KORA) requests.

The allegations raised in the first DCF referral were severe: exposure of the child to pornographic material, potential indicators of sexual addiction, emotional abuse, and neglect reported by a mandated reporter after a crisis hotline call involving the child's direct disclosure. These allegations fall squarely under PPM2 § 10200 (Conducting an Investigation) and K.S.A. § 38-2223 as requiring formal abuse/neglect investigation not discretionary "assessment."

Defendant Amanda Miranda, assigned CPS specialist from the Leavenworth DCF office, unilaterally reclassified the case as a "Family Assessment", thereby eliminating the requirement to issue formal findings, safety plans, or investigative reports. Despite the hotline's escalation,

Miranda altered the scope of the case to focus on "child behavior issues," while ignoring the original allegations of pornography exposure and potential sexual exploitation.

During her visit at Plaintiff's home with child, Miranda casually stated that she had just returned from a "horrific case" and that the office was severely understaffed encouraging Plaintiff to apply for a job at DCF, citing open listings. Plaintiff remained silent and across the other side of the room during the child's interview to avoid influence. The child was visibly anxious, nail biting, leg shaking and overwhelmed, disclosing difficult events and his disability and Ms. Miranda's off topic leading questions prevented him from staying on topic about the statements that were made during the crisis hotline phone call that started the investigation. It seemed as though Ms. Miranda was getting the cases confused and the details lost and unclear as to why she was there and what to investigate.

Plaintiff presented extensive corroborating evidence:

- Documentation of police reports and school involvement
- Phone logs with the crisis hotline
- Screenshots, photographs and digital proof of internet history at the father's home
- Reports from the Guidance Center and crisis team
- Follow-up requests to ensure continued child communication and safety planning

Miranda refused all follow-up opportunities, declined review of the evidence, and instead resorted to phone calls, despite Plaintiff's ADA accommodation request for communication to occur via text or email.

The child later attempted to reach Miranda to share new details and request updates on recommendations (anger management for the father, CASA assignment, and follow-up safety input). Miranda refused to speak to him again. Although she verbally stated to Plaintiff that she would recommend anger management and CASA assignment, those recommendations were never entered into the case record. She then suddenly started to be confused again with the cases and was questioning why Plaintiff was not allowing the child to be interviewed privately with her. That was not true and Plaintiff had asked multiple times, when there could be a follow up interview and Ms. Miranda read them and ignored those text messages.

Shortly after between July 16–25, 2024 an email surfaced from Andrew Bolton which cited a conversation with Amanda Miranda. The email included no headers, had stripped metadata, and consisted of cut sentences with Miranda's email signature attached. (Plaintiff alerted this to DCF attorney during these federal proceedings and was ignored). It falsely claimed that Plaintiff was "the problem" in the DCF case despite the fact that Plaintiff was never named in any abuse referral, had no findings, and was cooperating with all intervention efforts.

This falsified record became the basis of the later court appointed GAL narratives and court filings, despite the nonexistence of findings, an active ADA grievance, and a reclassification that violated policy and statutory duties. Miranda's conduct shows a combination of gross negligence, retaliation, and unlawful interference with due process and parental rights.

Ms. Miranda's handling of this first report violated DCF's standards in multiple ways:

- Failure to Investigate All Allegations: By ignoring the child pornography, neglect, emotional abuse and sexual risk allegations and treating the case as a minor child behavior issue pointing the finger at a child, Ms. Miranda violated DCF's policy mandate

to investigate reports of abuse in order to determine their validity and need for action. Nothing in the case met the criteria for simply a "Family in Need of Assessment" (FINA) with no abuse, yet the serious claims were effectively downplayed. DCF policy only permits an intake decision to be reversed or downgraded if additional information shows the report doesn't meet abuse/neglect definitions or other narrow circumstances. Here, no such justification existed – the proper response was a full abuse investigation. Ms. Miranda's premature closure of the case, with minimal fact-finding, violated these protocols and deprived D.L. of the protective intervention the law contemplates.

- Lack of Notice and Transparency: Instead of informing Plaintiff (the non-offending custodial parent) of the report and outcome, Ms. Miranda *never* mailed Plaintiff any official notice or finding. Plaintiff only learned *after the fact*, during a subsequent court hearing, that Ms. Miranda had closed the case as "unfounded" and had even documented disparaging opinions about Plaintiff's parenting. DCF policy requires that at initial contact, the family be informed of the specific allegations and that DCF is investigating. Furthermore, any findings from an investigation are typically to be documented and communicated. By concealing the very existence and result of the investigation from Plaintiff, Ms. Miranda violated basic procedural fairness and DCF's own practices. Her communications about the case were instead channeled to third parties without Plaintiff's knowledge or consent. As detailed below, this amounted to an unauthorized disclosure of confidential case information in breach of DCF policy.

- Violation of Confidentiality (Unauthorized Disclosure): Despite freezing Plaintiff out, Ms. Miranda shared her findings and opinions with individuals not authorized to receive confidential DCF records. In particular, she colluded, knowingly or unknowingly with the

Andrew Bolton to generate a false report for the courts, effectively arming the father's side in a custody dispute with DCF's unofficial stamp of disapproval of the mother and covering up child abuse by the father. DCF's confidentiality rules strictly limit disclosure of case information. Under PPM § 0315, records from an investigation *"shall not be made available"* to anyone outside the agency unless specifically authorized by the Secretary, by a DCF attorney for legal action, or by a court order. Even court-related releases must be to proper parties and often require a court order. Here, there was no pending DCF court case and no court order authorizing Ms. Miranda to divulge her investigative conclusions. By providing information to the Andrew Bolton and perhaps the opposing party in a private custody matter, Ms. Miranda knowingly disclosed confidential information about a DCF consumer (D.L. and his family) to unauthorized persons, a direct violation of PPM § 0316. Such an act is subject to disciplinary action and even criminal penalties. Plaintiff, on the other hand, as the child's mother had every right to be informed for the child's safety, yet was kept in the dark. DCF effectively gave the wrong people access and denied it to the one person (Plaintiff) who desperately needed the information to protect her son.

- Disability Accommodation Failures (Child's Needs Ignored): D.L. suffers from significant anxiety, psychological trauma that affect how he communicates. Ms. Miranda was informed or should have been aware that D.L. cannot easily discuss traumatic events verbally in a rushed interview – he becomes overwhelmed and may shut down or fixate or people please if directed to answer specific leading questions. Standard trauma-informed practice (and basic decency) would be to accommodate these needs, for example by allowing D.L. to write down his account or by consulting with his therapist

about how best to elicit information. Instead, Ms. Miranda spent only about 20 minutes

with the child, after coming directly from a high-caseload day, and pressed him with

questions he struggled to answer orally. D.L. later expressed that he felt Ms. Miranda was

in a hurry to dismiss his case as not serious, relative to others she had, and he was unable

to fully share his experience under those conditions. Ms. Miranda did not contact D.L.'s

treating therapist (Alison Dean) or his nurse practitioner – professionals who had in-depth

knowledge of D.L.'s conditions – even though speaking with those collateral sources

would have confirmed the abuse disclosures and the child's communication challenges.

By failing to accommodate D.L.'s disabilities in the investigative process, Ms. Miranda

violated DCF's anti-discrimination policy and the spirit of the ADA. DCF policy 0220

explicitly requires that all services be provided without discrimination on the basis of

disability, in compliance with the ADA. No individual is to be denied services or

protection because of a disability. Here, D.L. was functionally denied an equal

opportunity to be heard: the investigative process was not adjusted to his needs, resulting

in a superficial inquiry and erroneous conclusion that he was "not in danger." Such

handling not only contravenes DCF policy but also puts DCF in violation of Title II of the

ADA which applies to state entities' programs.

- Premature Case Closure and Lack of Safety Plan: Despite substantial red flags (e.g.
  D.L.'s own fear and the serious nature of the allegations), Ms. Miranda closed the case
  without any follow-up services or safety plan. She did not schedule a second visit or a
  family meeting; she issued no recommendations for counseling or monitoring. In fact, by
  closing the case as unfounded (then later retroactively changed that to cite there were no
  findings at all), she took no action. This left D.L. feeling betrayed and unsafe. As he later

told Plaintiff, these events gave him a "sense of distrust in DCF's commitment to protect him". DCF's mission is to protect children "within the requirements of law", assisting families to live together safely. Yet DCF's inaction here accomplished the opposite emboldening the abusive father and alienating the child.

C. Second Abuse Report – Mandated Reporter Ignored (August 2024). In mid-2024, D.L.'s therapist (Ms. Dean) filed a new report with DCF after D.L. disclosed additional instances of emotional abuse by his father during individual private therapy sessions. This second DCF report included *even more concrete evidence*: D.L. had written journals detailing the psychological harm and threats he experienced (such as the father threatened that the child would find him hanging in the garage by a rope when he comes home from school and goes through the garage to get into the house) instances of medical neglect (the father refusing to take child to ER for stitches, screening for cancer when a lump was found in child's chest, lapsing in medical health insurance than joking about not having him insured), and other emotional abuse. Despite this trove of evidence from a medical professional, Defendant Miranda ("Mandy") was again assigned and again dismissed the report without proper investigation. Ms. Miranda conducted no follow-up interviews with Plaintiff (who was unaware of many of these incidents until later) and failed to speak with other relevant professionals and only spoke to the father and met with the child at the father's home in a coercive controlling environment. In essence, she rubber-stamped the father as "innocent" and prematurely closed the second report just as she had the first.

- Bias and Retaliatory Attitude: During the brief interaction related to the second report, Ms. Miranda's confirmation bias against Plaintiff became even more apparent. Upon learning that D.L. was making new abuse reports to another mandated reporter, Ms. Miranda pointedly asked the child *"Is your mother telling you to say this?"* – suggesting

15

she was more inclined to suspect coaching by Plaintiff than to believe the child's accounts of his father's behavior. In fact, these new disclosures were made privately by D.L. to his therapist and doctors, at times when Plaintiff was not even present or aware. The records show that D.L. emailed his mother *after* these abuse incidents or told her only after returning from his father's custody time – meaning Plaintiff herself was learning of the abuse after the fact, not directing it. Ms. Miranda ignored this reality and persisted in a theory that absolved the father and painted the child as not credible, which created a smear campaign that the child was lying or the Plaintiff had Munchausen by Proxy, rather than address the documented reports of mandated reporters. This adversarial, dismissive stance violated DCF's obligation to conduct an objective assessment. It was retaliation: by implying the child's reports were fabricated (and focusing suspicion on Plaintiff for merely advocating for her son after she learned about his reports to these mandated reporters), Ms. Miranda chilled the very reporting that DCF depends on to protect children. Indeed, DCF policy prohibits punishing or deterring those who report or cooperate in investigations; the agency should be facilitating honest communication, not casting blame on a child or their non-offending parent for trying to protect her child.

- Continued Disability Violations: Ms. Miranda's handling of the second report continued to flout ADA/§504 principles. She did not adjust her approach despite knowing by now that D.L. struggled in her prior interview. She did not offer any alternative means for D.L. to share (for instance, inviting him to write down what happened, or allowing the therapist to be present to support him), items of accommodations that the therapist had specifically written in the treatment plan for the child to do when asked about traumatic

events to help child communicate through writting. Nor did she acknowledge that the father's actions were exacerbating the child's disabilities. The father's isolation of the child are forms of harm that disproportionately impact D.L. given his condition – effectively denying D.L. the accommodations he needs. By dismissing these concerns, DCF failed in its affirmative duty to accommodate. Agency policy and federal law required DCF to *protect* a child with a known disability from being placed in a situation that worsens that disability through abuse or neglect and it was caseworker's job to investigate for disabilities and interview therapist during the wrap around crisis team 90 day treatment plan directed by the Guidance Center of Leavenworth. Instead, DCF's inaction left D.L. in a situation that violated his ADA rights to have his medical and psychological needs reasonably safeguarded rather than deliberately ignored.

- Pattern of Non-Action: After the second report, Ms. Miranda again took no steps to ensure D.L.'s safety. Plaintiff was not consulted or informed of the details. No collaboration was made with Guidance Center or referral was made to any Family Preservation, anger management classes, CASA or preventive services. Ms. Miranda had, by this point, formed a fixed outcome – treating the case as an annoyance to be closed quickly rather than a child in crisis requiring help. The father, emboldened by DCF's lack of intervention, continued to escalate his abusive behaviors. Among other things, Plaintiff later discovered that the father was planning to remove D.L. from the state (immediately only a couple hours after the DCF visit) to evade scrutiny. Plaintiff urgently reported this risk to Ms. Miranda, but it was met with indifference. DCF's policies emphasize that if new information arises indicating a child may be unsafe (such as plans to flee the jurisdiction), the agency should respond or at least coordinate with law enforcement. No

such coordination exists and open records verify there was no record or attempt to notify

law enforcement made by Ms. Miranda. Here, glaring safety signals were ignored.

In summary, between July and September 2024 two separate mandated reporters (a crisis hotline

and a therapist) had each sounded the alarm about D.L.'s welfare. Both times, Defendant

Amanda Miranda violated core DCF policies and the rights of the child and Plaintiff by failing to

investigate thoroughly, breaching confidentiality, and dismissing abuse in a manner inconsistent

with both law and agency rules. These actions (or inactions) deprived Plaintiff and her son of the

protective services and fair process they were entitled to, setting the stage for further harm.

D. Third Abuse Report – Physical Abuse Evidence Dismissed (September 2024). On or about

September 2024, during a medical appointment, D.L. again privately disclosed to his physician

Dr. Jordan Walter that his father had been physically abusing him. Specifically, D.L. reported

incidents leading to significant weight loss, daily stress-induced nosebleeds, numbness in his

hand (from physical trauma), stomach pain, headaches, insomnia, panic attacks, bloody nail

biting, difficulty concentrating, loss of appetite and other signs of escalating abuse. In response,

Dr. Walter – another mandated reporter – filed a third report with DCF, this time alleging

physical abuse and neglect by the father. This report was assigned to Defendant Heather Dunz, a

DCF investigator in Johnson County, Kansas. Unfortunately, Ms. Dunz continued the pattern of

DCF's gross mismanagement:

- Superficial "Investigation" and Dismissal: Ms. Dunz conducted only a brief visit to the

  father's home. During that single visit, she observed the child in the father's presence and

  later claimed she saw "no evidence of physical abuse" without ordering a forensic sweep

  and set on deciding to close the case. On that exceedingly thin basis, Ms. Dunz dismissed

  Dr. Walter's report. She did not visit Plaintiff's home or follow up with Plaintiff after

Plaintiff report more evidence of what the child was stating through emails, cell phone video documenting panic attacks and the father specifically removing his disability medication to prevent him from taking it to calm down and calling the medication "immoral", police reports, child's emails to his grandmother reporting that he is now being threatened that if he continues to speak out that they will make it worse for his mom in court and his Honor's grades collapsing under the pressure of the coercive control that forced him into isolation, removing all extracurricular activities and all devices to threaten the child into silence. She did not review or request the extensive documentation that existed. She made no effort to contact law enforcement, even though physical abuse of a child can be a crime and DCF is expected to notify police when serious physical abuse is alleged. In short, Ms. Dunz's "investigation" fell far below the standard of care: she again took the abuser's word at face value after a cursory meeting and decided the child was the problem and closed the case. This violated the same DCF duty to thoroughly investigate and protect as described earlier. The dangers were foreseeable – indeed, by this point there had been multiple reports in DCF's system about this family. Rather than recognize a pattern, DCF treated each report in isolation and consistently sided with the abuser and against the child. Such deliberate indifference to recurring credible reports amounts to a systemic failure.

- Ignoring Substantial Evidence: At the time of Ms. Dunz's involvement, Plaintiff had already gathered substantial corroborating evidence of the abuse. For example, there were videos showing the father's aggressive outbursts toward D.L., medical records noting D.L.'s rapid weight loss and stress symptoms, and school reports of the child's decline in functioning. None of these were considered by DCF. Ms. Dunz did not reach out to Dr.

Walter for a detailed consult on the child's condition, school staff, therapist, grandmother, family friends of the child that submitted affidavits or police to discuss the physical abuse on August 15, 2024. By ignoring readily available evidence, Ms. Dunz violated DCF's Case Documentation and Assessment policies, which require that pertinent information (from collaterals, professionals, etc.) be collected and evaluated before closing a case. Her perfunctory approach contradicted the very purpose of an assessment – which is to determine if the child is safe or in need of care.

- Failure to Coordinate or Escalate: Given that this was at least the third report concerning the same child, involving escalating abuse (now physical harm), proper procedure would dictate a higher level review or staffing. DCF Policy notes that multiple reports on the same incident or child may warrant consolidation or override of previous decisions, and require supervisor review to ensure no report "falls through the cracks". There is also an expectation that if an alleged perpetrator has had repeated reports, or if prior reports were not fully investigated, a fresh report should trigger a careful reevaluation (sometimes known as a "critical case consult" or Best Interest Staffing in severe cases). No such escalations occurred. Ms. Dunz did not confer with Ms. Miranda or compare notes on the family's history. She did not alert any Quality Assurance or administrative review team that two offices (Leavenworth and Johnson County) had now handled three related intakes with incongruent outcomes in 3-4 months. The lack of internal communication and oversight meant that glaring inconsistencies (such as DCF records at one point listing three "closed" investigations for D.L. when only one closure letter was ever documented) were never reconciled. As Plaintiff later discovered through records requests, DCF's handling of the case was so disjointed that its responses to her KORA inquiries conflicted

with what workers had told her orally (e.g. DCF staff referenced three closed cases, but official KORA records showed only one closed and one still "pending"). This suggests possible manipulation or misclassification of DCF's records – an issue addressed further below.

- Ongoing Secrecy and Exclusion of Plaintiff: Consistent with the prior incidents, DCF (under Ms. Dunz) still refused to share any findings or safety information with Plaintiff, the child's mother. By the time of the third report, Plaintiff was actively trying to obtain DCF records because she was alarmed at being kept uninformed while her son's situation worsened while he was at his father's home. She filed a formal Kansas Open Records Act (KORA) request in early 2025 seeking the complete DCF case file on the abuse reports. In response, DCF produced only redacted and incomplete records, omitting the most critical portions – such as D.L.'s disclosures documented by workers and the true disposition of each report. DCF's production was so misleading that it, for example, failed to disclose the existence of one of the abuse investigations entirely. When Plaintiff compared what she received to the minimal information she had gleaned from other sources, it appeared DCF was either withholding or had destroyed parts of the record to cover up the lack of proper investigation. (Notably, DCF policy requires that all investigative case records be retained indefinitely for cases accepted for investigation, even if unsubstantiated, and explicitly forbids destroying any record while an audit, appeal, or review is pending. Plaintiff's active inquiries and complaints constituted such pending matters, meaning no records should have been destroyed or omitted.) By providing conflicting accounts of the case history and failing to produce a full record,

DCF violated not only the transparency required by KORA, but its own 0440 Retention
of Records policy and general standards of case management integrity.

E. Escalation of Harm to the Child: As a direct consequence of DCF's inaction on these reports,
D.L.'s situation deteriorated severely. With each "pass" that DCF gave the father, the father grew
more brazen in abusing and isolating the child. By late 2024, after the third report was dismissed,
the father had:

- Completely isolated D.L. from outside support – he pulled D.L. out of all extracurricular
  activities, replaced therapists with ones that would never report child abuse, changed
  medical doctors, refused to give school disability medication and restricted all his
  communications, in order to prevent D.L. from speaking to teachers, relatives, or others
  who might report concerns. D.L., who had been an A+ honor roll student, saw his grades
  plummet to C's, D's and F's on homework, tests, projects and flat out not doing
  assignments either due to stress and lack of support.

- Interfered with D.L.'s medical care – ignoring doctors' recommendations to *increase*
  therapy and medication for D.L.'s anxiety, and needing to be seen monthly with quarterly
  bloodwork checks (father skipped 2.5 months and its been a year of no bloodwork done)
  and instead pressuring D.L. to stop taking his prescribed medication altogether. This
  medical neglect was exactly the kind of issue reported by the therapist and doctor, yet
  now it intensified unchecked.

- Engaged in overt retaliation and intimidation – threatening D.L. that if he continued to
  seek help or even mention his suffering (for instance, emailing his grandmother about his
  daily nosebleeds and fear), it would "get [his] mom in more trouble". The court-
  appointed former GAL delivered similar threats to D.L., warning him that telling the truth

would only make things worse for his mother. This campaign of fear worked: by early

2025, D.L. was afraid to reach out for help at all, convinced that no one – not even DCF –

would protect him. He told Plaintiff he believed *"DCF is pointless and will never take*

*what I'm saying seriously, so all I can do is stay alone in my room".* This heart-breaking

resignation in a child is the clearest evidence of the state-created danger at issue: through

its repeated failure to act, the State (DCF) signaled to D.L. that he was on his own,

thereby magnifying the power his abuser held over him.

By January 2025, D.L. was in a state of emotional and psychological collapse. He exhibited

somatic symptoms (frequent nosebleeds, insomnia, stomach pain, headaches) and had lost a

significant amount of weight. He was formally diagnosed by medical professionals with trauma-

induced psychiatric injury as a direct result of the prolonged coercion, isolation, and institutional

neglect he experienced. These harms are ongoing and irreparable absent intervention.

After exhausting administrative channels and DCF grievance procedures, Plaintiff continued to

report the child's emails and events to law enforcement. For six months, her request for criminal

charges were suppressed or disregarded, until ultimately a Special Victims Unit (SVU) detective

was assigned to investigate the allegations.

That investigation uncovered substantiated evidence of physical abuse, including an incident on

August 15, 2024, and referred the matter to the Johnson County District Attorney's Office for

potential criminal battery charges against the father.

During school-based interviews with D.L., the child confirmed the abuse but expressed

hesitation fearing that reporting it might result in "getting in trouble" with his father and that in

order to be close with his dad he needs to erase his mother. This dynamic underscores both the

psychological coercion the child was under and the heightened need for independent safety planning.

Instead, DCF failed to act on the criminal referral or re-open the case. During this time, Plaintiff the non-offending parent was paradoxically restricted to supervised visitation, based not on judicial findings but on a pattern of narrative manipulation that framed her as "the problem." These allegations stemmed from DCF notes, former GAL summaries, and unverified hearsay third-party ghosts, many of which pre-dated any contact between Plaintiff and her son indicating that false reports were used to suppress Plaintiff's advocacy, discredit the child's disclosures, and deflect attention from the actual abuse.

This misuse of state power including the suppression of ADA grievances, refusal to act on criminal child abuse disclosures, and enforcement of restrictive visitation based on forged or retaliatory narratives constitutes a structural due process violation and supports claims under 42 U.S.C. §§ 1983, 12203, and Rule 60(d)(3).

F. Plaintiff's Exhaustion of Remedies ("System Failure"). Throughout this period, Plaintiff took every measure available to protect her son using lawful and official channels. The system utterly failed her at each step:

- Internal DCF Grievances: Plaintiff filed formal grievances with DCF's Office of Client Services (the designated department for client complaints) in November 2024, detailing the mishandling of the abuse reports and the lack of appropriate action. One grievance, emailed on November 4, 2024, explicitly outlined the failures of "Mandy" (Amanda Miranda) in the first two investigations and requested an immediate review and corrective action. Rather than receive a transparent review, Plaintiff was met with obfuscation and

harassment from DCF staff. Specifically, *instead of a written response or meeting*, the Leavenworth DCF office began calling Plaintiff by phone repeatedly – calls which were not clearly about investigating the grievance, but rather aimed at dissuading her. Plaintiff has a disability that affects communication processing, and she had expressly requested ADA accommodation to communicate in writing (email). DCF ignored this request and persisted in phone calls. When Plaintiff did answer a call, it was Ms. Lisa G., the direct supervisor of Ms. Miranda, on the line. Ms. Lisa G. did not appear to be conducting a neutral inquiry; instead, she pressed Plaintiff with questions like "why are you so unhappy?" and disputed that certain incidents constituted "emotional abuse". Plaintiff immediately sensed that the supervisor was defensive and intent on protecting her worker rather than addressing the complaint. Plaintiff even asked whether someone else should be listening to the call, because it felt like Ms. G. was gathering information to retaliate. When Plaintiff questioned the appropriateness of the call and reiterated that she needed to handle this by email due to her disability, Ms. G. eventually said she would "send it to my supervisor instead". In an email on January 31, 2025, Plaintiff informed the DCF regional administrator that she had no clarity on the proper grievance process and had effectively gotten nowhere. DCF's own publications indicate that client disputes should be settled via a chain of command and grievance procedure, rather than forcing the individual to resort to court. Here, however, DCF's grievance procedure (if one truly existed) was not followed at all. Instead of elevating Plaintiff's concerns to an impartial reviewer or panel, the complaint was handed back to the very local office implicated, resulting in predictable defensiveness and zero accountability and disappeared. This handling deviates from any reasonable protocol and denied Plaintiff a meaningful opportunity to

resolve her issues within the agency. Indeed, the retaliatory tone of the follow-up (DCF calling to challenge Plaintiff's perceptions and insinuate she was wrong to complain) likely violated DCF's own employee conduct rules and whistleblower protection policies.

- ADA Advocacy: In fall 2024, Plaintiff reached out to the newly established Kansas Office of the Child Advocate (an independent oversight agency) and explicitly framed her situation as an urgent ADA issue and child endangerment issue. She described how DCF's failures were putting her disabled son at risk and how the DCF staff were not accommodating her own communication disability in the grievance process. The Child Advocate's office responded on October 14, 2024, by directing Plaintiff to file a grievance with DCF's Client Services and provided her the contact information (which she did, as noted). After the frustrating response from DCF, Plaintiff again emailed the Child Advocate on December 18, 2024, essentially saying, "I followed the process, and now I'm getting harassing calls – what is the next step?" Unfortunately, it appears the Child Advocate's involvement did not compel DCF to correct course. At most, DCF's regional administrator (Christi Wilhoite) emailed Plaintiff offering to "connect" by phone. By that point, however, Plaintiff had justifiably lost trust in phone calls and was seeking a written resolution or meeting with higher-ups. No substantive relief came from this avenue. The promises of the ADA – that individuals with disabilities (including parents in the child welfare system) have equal access to services and participation – were hollow in practice. Plaintiff's ADA rights (and those of D.L.) were continuously brushed aside by DCF.

- Kansas Open Records Act (KORA) Complaint: In 2024/2025, after DCF's document production omitted critical records, Plaintiff filed a formal KORA complaint with the

Kansas Attorney General's Office (which has oversight of KORA enforcement). She provided the AG's office evidence that DCF had failed to release complete abuse investigation files and had given conflicting accounts of the case's existence/status. In January 2025, the Attorney General's Office summarily closed Plaintiff's complaint, finding "no violation" and she was lucky to get anything by DCF. This response came despite clear discrepancies in DCF's records. In effect, the AG's office rubber-stamped DCF's secrecy, depriving Plaintiff of the transparency relief that KORA is meant to provide. The Attorney General's indifference is especially troubling because it removed the last avenue at the state level for Plaintiff to obtain information critical to protecting her child. Had the AG's office performed a good-faith investigation of the KORA complaint, it would likely have uncovered DCF's internal policy violations and perhaps prompted DCF to rectify them. Instead, the AG's office chose institutional loyalty over the truth, further entrenching the constitutional deprivations.

- Legislative Appeal: As a last resort, Plaintiff contacted her state legislator. In early 2025, Plaintiff shared her story and grievance correspondence with Kansas State Representative hoping that legislative oversight might spur DCF to act. While Rep. was sympathetic, legislative inquiries (if any were made) did not yield results before this lawsuit. The very need for a constituent to ask a state representative to intervene in an active child safety case underscores how extraordinary and broken the system had become.

At every turn, Plaintiff either met a dead-end or faced retaliation for speaking up. By summer of 2025, more than a year after the first abuse report, it was evident that no part of the Kansas child welfare system or related oversight bodies would fulfill their duty to protect D.L. or to vindicate Plaintiff's parental rights. Plaintiff had exhausted the DCF grievance process (to the extent one

existed), sought help from the independent Child Advocate, pursued administrative records remedies, and sounded alarms to state officials – all to no avail. DCF's supervisors either ignored her or actively obstructed her (as with the phone harassment), and no higher authority stepped in to correct these wrongs. This systemic inertia and hostility left Plaintiff no choice but to seek relief from the federal court, which she now does through this lawsuit.

G. Deviations from DCF Protocols: The facts above illustrate numerous deviations from DCF's own written protocols and accepted practices, including but not limited to:

- PPM § 2100 (Investigation Procedures): Requiring prompt, thorough investigative interviews and evidence-gathering for abuse/neglect reports. Defendants Miranda and Dunz blatantly failed to meet this standard, effectively conducting sham investigations.

- PPM § 0315 & 0316 (Confidential Records and Disclosure): Mandating confidentiality of case information and limiting disclosure to authorized persons. Ms. Miranda's communication of case findings to a Andrew Bolton and possibly others in a private litigation context violated these provisions, while Plaintiff – who had a legitimate right to the information – was denied access.

- PPM § 0220 (Non-Discrimination): Requiring DCF to comply with the ADA and not deny services or participation due to disability. Defendants' failure to accommodate D.L.'s and Plaintiff's disabilities contravened this policy and Title II of the ADA.

- PPM § 0440 (Records Retention): Prohibiting destruction of case records while any review or grievance or appeal is pending, and requiring retention of all investigation files indefinitely. DCF's inability or unwillingness to produce a complete record, and the inconsistencies in its record-keeping (e.g., "missing" case files), suggest non-compliance

with this rule. At minimum, DCF failed to be forthright about case record status, undermining the intent of 0440.

- Grievance and Chain-of-Command Resolution: While not codified in a single PPM section, DCF's public guidelines indicate that complaints should be handled through the chain of command and a formal grievance procedure rather than dismissed. In Plaintiff's case, this process broke down entirely – her grievance was not properly escalated or resolved. The spirit of accountability that such procedures exist to promote was absent. Instead of treating Plaintiff's grievance as an opportunity to identify and correct errors for D.L.'s safety, DCF treated her as a nuisance. This is a systemic failure contrary to the agency's role.

In summary, the violations of DCF policy by Defendants Miranda and Dunz were not mere internal matters; they directly correlate to violations of Plaintiff's and D.L.'s constitutional and statutory rights. DCF policies, when followed, exist to prevent the very harms that occurred – wrongful disclosure of confidential information, lack of due process for parents, discrimination against persons with disabilities, and failure to act on known dangers to a child. The breach of these policies is evidence of deliberate indifference and unconstitutional custom or practice, as detailed in the legal claims below.

Claims for Relief

COUNT I – Violation of Fourteenth Amendment (Due Process)
*(42 U.S.C. § 1983 – Against Defendants Amanda Miranda and Heather Dunz)*

1. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

2. Fundamental Liberty Interest: Plaintiff has a fundamental liberty interest in the care, custody, and management of her child, as recognized by the U.S. Supreme Court (see *Santosky v. Kramer*, 455 U.S. 745 (1982); *Troxel v. Granville*, 530 U.S. 57 (2000)). D.L., as a child, likewise has liberty and safety interests protected by the Constitution (including the right to be kept from harm when the state undertakes to act on his behalf).

3. Denial of Notice and Opportunity: Defendants deprived Plaintiff of procedural due process by concealing critical information and proceedings involving her child. Specifically, Defendants failed to notify Plaintiff of abuse disclosures and investigations, excluded her from any chance to present evidence or respond, and enabled judicial actions (in the domestic court) to proceed without her informed involvement by withholding exculpatory and relevant information. At the same time, DCF officials were communicating case information to unauthorized third parties compounding the prejudice to Plaintiff and accusing child of being a liar. No notice or fair opportunity to be heard was provided to Plaintiff before effectively adjudicating (through DCF's internal process) the validity of her son's abuse reports and, by extension, Plaintiff's custodial fitness. This one-sided process falls far short of the "minimum procedural guarantees" required by *Goss v. Lopez*, 419 U.S. 565 (1975), even for temporary deprivations of a protected interest. Here, Plaintiff was completely deprived of her right to protect her child and her reputational interest as a fit parent without any hearing at all.

4. Concealment and Falsification: Defendants' actions in concealing abuse disclosures, failing to document or outright destroying evidence of reports, and falsifying or biasing investigative records (e.g., by attributing false blame to Plaintiff) resulted in a dangerous distortion of the truth-seeking process. This distortion infected both the agency's

handling and the related court proceedings, such that Plaintiff was prevented from presenting her side or correcting the record. The intentional concealment of D.L.'s statements and the DCF findings from Plaintiff deprived her of the opportunity to rebut or appeal those findings through the normal administrative channels (for instance, an appeal of a substantiation, had there been one, or a request for agency review of an unfounded finding based on incomplete information). In doing so, Defendants violated Plaintiff's right to procedural due process.

5. Stigma-Plus Injury: Moreover, by disseminating false and stigmatizing information (that Plaintiff was "the problem" or an unfit mother) to Andrew Bolton and perhaps the court, without Plaintiff's knowledge, Defendants damaged Plaintiff's reputation and standing in the custody court, leading to adverse outcomes (a "stigma-plus" liberty interest violation). Plaintiff suffered the effective loss of custody time, a shock to the conscience and decision-making with respect to D.L. as a result of these underhanded actions by state actors, all without procedural safeguards.

6. Child's Due Process Rights: D.L.'s own due process rights were infringed insofar as he was entitled to have his abuse reports properly heard and considered by the state agency. Instead, his pleas for help were ignored and he was deprived of protection without any rational process. The child had a right to be free from state deception and concealment that increased his risk of harm (as recognized in *Schwartz v. Booker*, 702 F.3d 573 (10th Cir. 2012), state officials cannot mislead or withhold information in a manner that forecloses a person's ability to protect themselves). Here, DCF's withholding of information and false assurances that "no abuse was found" misled D.L. (and those who could have helped him) into a false sense of hopelessness, exacerbating his vulnerability.

7. Resulting Constitutional Injury: The acts and omissions of all Defendants were not merely negligent missteps; they were deliberate, repeated, and egregious, displaying a knowing disregard for Plaintiff's and D.L.'s rights. These actions were the moving force behind the constitutional injuries suffered: Plaintiff's loss of her parental role and opportunity to protect her child, his ADA advocate and D.L.'s continued exposure to abuse and ensuing trauma. But for Defendants' conduct, Plaintiff would have intervened earlier and more effectively to safeguard her son, and the outcome of custody and protection proceedings would likely have been different.

COUNT II – Violation of First Amendment (Retaliation)

*(42 U.S.C. § 1983 – Against Defendants Miranda and Dunz)*

1. Plaintiff incorporates all prior paragraphs.

2. Protected Activity: Plaintiff engaged in First Amendment protected activity by petitioning the government for redress and speaking out about the abuse and DCF's failures. This included: filing internal grievances and complaints, making KORA requests (a form of petition for information), reporting concerns to the Child Advocate and other officials, and generally objecting to her exclusion and her son's endangerment. Plaintiff's expressions – written grievances, emails detailing misconduct, and even this lawsuit – are activities protected by the right to free speech and to petition the government.

3. Adverse Actions: Defendants, particularly through DCF officials, responded to Plaintiff's protected activities with a pattern of retaliation that was outside of their duties. As detailed above, when Plaintiff filed grievances and public record requests, DCF officials: (a) subjected her to harassing phone calls and hostile questioning about why she complained; (b) unjustifiably withheld records that she had a right to obtain, thereby

32

impeding her oversight efforts; (c) continued to exclude her from decision-making and information, essentially punishing her by stonewalling; and (d) on information and belief, treated her complaints with prejudice (evidenced by the dismissive, biased tone of the DCF supervisor's response). This campaign of obstruction would deter a person of ordinary firmness from continuing to press complaints. Indeed, the phone call Plaintiff received in response to her grievance – wherein the DCF supervisor told Plaintiff was wrong to label the father's conduct as abuse and interrogated her unhappily – is a prime example of an adverse action intended to chill Plaintiff's advocacy. Rather than address the issues raised by the child, DCF's message was effectively "stop complaining."

4. Causal Connection: There is a clear causal connection between Plaintiff's protected activity and the adverse actions. Plaintiff's grievance emails triggered the harassing calls almost immediately (temporal proximity and direct reference to her grievance in the call prove the link). Similarly, Plaintiff's persistent requests for records and transparency angered DCF officials, who then circled the wagons and refused to cooperate. The Kansas AG's Office's quick dismissal of Plaintiff's KORA complaint– Plaintiff's act of calling out DCF to another state agency was met with that agency's brushoff, suggestive of a retaliatory alignment between DCF and the AG's Office to silence a troublesome complainant.

5. Chilling Effect and Injury: The retaliatory conduct did indeed chill Plaintiff's First Amendment rights. Plaintiff felt intimidated and feared that continuing to push would only invite more reprisal or further harm to her and her child (as evidenced by the former GAL's threat to the child that the mother would "get in more trouble" if the child kept speaking up). Nonetheless, Plaintiff persevered to the extent she could – but the law does

not require that she be completely silenced to claim retaliation. It is enough that

Defendants' actions were *intended* to deter and *had a chilling tendency*. The adverse

actions had no legitimate purpose: DCF officials had no valid reason to deny Plaintiff a

fair grievance process or full records apart from dislike of her complaints. Such conduct

violates the First Amendment. (*Hartman v. Moore*, 547 U.S. 250 (2006) recognizes that

retaliation for petitioning the government is actionable; *Worrell v. Henry*, 219 F.3d 1197

(10th Cir. 2000) sets the three-part test for First Amendment retaliation, which Plaintiff

satisfies here by showing her protected activity, Defendants' adverse responses, and the

retaliatory motive.)

6.  As a direct result of this retaliation, Plaintiff suffered injury: the obstruction impeded her

    ability to gather evidence, to be heard by officials, and to protect her son. It also caused

    emotional distress, as Plaintiff had to fight not only an abusive co-parent but also the very

    state actors tasked with helping her child as now the people choosing not to believe a

    child's own words. The chilling of these rights is itself a constitutional harm warranting

    relief.

COUNT III – Violation of Substantive Due Process: State-Created Danger and Bodily Integrity

*(42 U.S.C. § 1983 – Against Defendants Miranda and Dunz)*

1.  Plaintiff incorporates all prior paragraphs.

2.  Affirmative Acts Increasing Risk: Under the state-created danger doctrine (see *DeShaney

    v. Winnebago Cty.*, 489 U.S. 189 (1989); *Currier v. Doran*, 242 F.3d 905 (10th Cir.

    2001)), state officials can be liable when their affirmative actions create or exacerbate

    danger to an individual. In this case, Defendants' actions affirmatively created and

    exacerbated the danger to D.L., violating his substantive due process right to bodily

integrity and safety. By misrepresenting the situation and concealing known abuse,

Defendants lulled Plaintiff and other would-be protectors into a false sense that "no

intervention was needed," thereby leaving D.L. exposed to ongoing abuse that the state

knew about. They also effectively signaled to the abuser (the father) that he could

continue without state interference because they did not believe a child who was pleading

for help and making reports on his own to mandated reporters, which predictably led to

escalated harm.

3. Knowledge of the Danger: Defendants were well aware of the substantial risk to D.L.

Each abuse report put them on notice that D.L.'s father was engaging in dangerous

behavior (psychological abuse, coercive control, threats, medical neglect, physical harm).

By the third report, the risk was extreme and imminent (the child was showing physical

trauma and police officer asked if child needed an ambulance in their report). Thus, this

is not a case of hidden or speculative danger – it was open and documented, satisfying the

requirement that the state actors knew of the risk of harm.

4. Conscience-Shocking Conduct: Defendants' failure to act in the face of this knowledge,

combined with their actions to thwart Plaintiff's rescue efforts, rises to the level of

conscience-shocking behavior needed for a substantive due process violation. It is

conscience-shocking to *deliberately* refuse to protect a child out of bureaucratic

convenience or animus, and to mislead those who might help. The conduct here was

egregious and outrageous in the constitutional sense: DCF officials abandoned a child to

an abuser and impeded the fit parent's attempt to save the child. This goes beyond mere

negligence; it approaches a form of collusion with the abuser (even if not intentional, that

was its effect). The Tenth Circuit's decision in *Armijo v. Wagon Mound Public Schools*,

159 F.3d 1253 (10th Cir. 1998) is instructive: state actors were held liable where they knew of a student's suicidal tendencies yet sent him home alone with a gun available, creating the danger. Here, Defendants knew of abuse and yet effectively sent D.L. back into that abuse repeatedly and cut off his avenues of help – a parallel degree of culpability.

5. Facilitating Retaliation and Coercion: Additionally, by communicating to the GAL and others that DCF found no issues (and by not substantiating the abuse), Defendants facilitated the retaliation against D.L. The GAL and father explicitly used DCF's inaction as part of their coercion – telling D.L. no one would believe him because even DCF closed the case, and threatening him with DCF-backed authority (e.g., "it'll get your mom in trouble"). In this way, Defendants lent the color of state authority to the abuser's campaign of silencing the child. This is an extraordinary abuse of power that strips away the child's sense of security and bodily autonomy, violating the child's right to be free from state-empowered abuse. *Schwartz v. Booker*, 702 F.3d 573 (10th Cir. 2012) recognizes that when state officials, by their affirmative conduct, induce reliance on false information and thus endanger a person, it can be actionable. Here, DCF induced D.L. to rely on the idea that help was not coming and that speaking out was futile, which is akin to tying the hands of a drowning victim.

6. Injury: As a result of Defendants' state-created danger, D.L. suffered grievous harm to his body and mind. The abuse continued when it could have been stopped. The psychological trauma was magnified, potentially for life. Plaintiff, as his mother, also suffered the loss of her child's bodily integrity and well-being, which courts have recognized can give rise to a parent's substantive due process claim in extreme cases

(interference in the parent-child relationship through egregious abuse caused by state action). This count thus encompasses both the child's direct claim and the derivative impact on Plaintiff's fundamental liberty interest in her familial relationship.

7. Defendants' conduct meets all elements of a state-created danger claim: (1) they created or increased the danger to D.L. through affirmative acts (concealment, fraud, misinformation, non-removal); (2) D.L. was a known, discrete victim as opposed to a member of the general public – indeed, DCF knew him by name and had an open case on him; (3) Defendants' actions put D.L. at substantial risk he would not otherwise have faced (had they acted properly, he might have been removed from the abusive situation or at least the father constrained; instead, the danger was left to fester); and (4) the failure to protect was, in context, shocking to the conscience and deliberately indifferent to the known risk. Therefore, Defendants are liable for violating substantive due process under a danger-creation theory.

COUNT IV – Violation of Americans with Disabilities Act (Title II) and Rehabilitation Act (Against Amanda Miranda and Heather Dunz – in both official and individual capacities)

1. Plaintiff incorporates all prior paragraphs as if fully set forth herein.

2. Plaintiff and her minor son, D.L., are qualified individuals with disabilities within the meaning of the ADA and Section 504.

   o Plaintiff has documented communication disabilities, including auditory processing disorder and trauma-induced anxiety, which substantially impair her ability to communicate under stress, particularly via phone or in real-time verbal interactions.

o D.L. has diagnosed mental health conditions including anxiety disorder and complex trauma, which substantially limit his verbal processing and ability to respond to stress or recount traumatic events verbally.

3. Defendants Amanda Miranda and Heather Dunz, acting under color of state law and as agents of a public entity receiving federal funds, engaged in conduct that deprived Plaintiff and D.L. of meaningful access to state services on the basis of disability. The following acts demonstrate their individual and official violations of federal disability law:

a. Miranda and Dunz refused to implement reasonable modifications to Plaintiff's known disability-based communication needs. Despite repeated requests from Plaintiff to correspond by email instead of phone, both Defendants either ignored, delayed, or weaponized her requests, including hanging up on her, refusing to respond by email, or using phone-only communication to confuse and exclude Plaintiff from meaningful participation in case planning, grievance processing, and safety decisions. This refusal constituted a textbook violation of Title II's reasonable accommodation mandate and Section 504's access requirements.

b. Miranda failed to accommodate D.L.'s communication disabilities during the initial abuse investigation. Despite knowing D.L. had difficulty verbally expressing trauma in interviews, Miranda failed to allow written responses, the involvement of his therapist, or any trauma-informed support. Instead, Miranda improperly dismissed the outcry as lacking credibility due to D.L.'s speech patterns — which were direct manifestations of

his disabilities. The failure to adjust the procedure unfairly penalized D.L. and obstructed protective services from functioning as intended for a disabled child.

c. Dunz likewise failed to initiate any accommodations for D.L. despite receiving follow-up reports of physical abuse and mental health deterioration. Dunz took no steps to modify interviews, safety planning, or offer supportive services. Instead, Dunz continued to operate on assumptions that favored the abuser and discounted the child's expressed fears and history — all without reference to his disability needs.

d. Plaintiff filed formal ADA grievances and requests for accommodation, both to DCF directly and to the Kansas Office of the Child Advocate. In response, Dunz escalated harassment, and supervisors called Plaintiff in a confrontational tone — an act of retaliation. The timing and content of these responses show an intent to intimidate and punish Plaintiff for asserting federally protected rights under the ADA, in violation of 42 U.S.C. § 12203(b).

4. The acts of Miranda and Dunz caused ongoing harm. Plaintiff was deprived of the ability to meaningfully participate in proceedings and to ensure her child's safety. D.L. regressed psychologically and lost access to accommodations, therapeutic interventions, and basic trauma-informed care due to Defendants' exclusion and inaction.

5. These failures, in both personal and official capacity, demonstrate deliberate indifference or at minimum, reckless disregard for the rights of disabled individuals. A non-disabled parent and non-disabled child would not have suffered the same exclusion or credibility discounting in investigations, triggering a disparate impact claim under Section 504.

6. Plaintiff seeks the following relief:

- o   A declaratory judgment that Defendants violated the ADA and Section 504;

- o   Injunctive relief requiring training for state workers on ADA obligations;

- o   Orders requiring Defendants to modify their communication practices and decision-making procedures when dealing with disabled parents or children;

- o   An award of attorneys' fees and litigation costs if applicable under 42 U.S.C. § 12205;

- o   Any further equitable relief the Court deems just and proper.

7.  Plaintiff preserves her right to amend this complaint to include claims under 42 U.S.C. § 1983 (failure to intervene), Kansas negligence law, and retaliation under the Kansas ADA if discovery reveals additional coordination or instructions to suppress protected ADA advocacy.

Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief against Defendants Amanda Miranda and Heather Dunz, each in their personal and official capacities:

A. Declaratory Relief

A declaration that Defendants' actions and omissions specifically including the concealment and destruction of abuse records, procedural exclusion of Plaintiff from investigations, retaliation for ADA-based grievances, and deliberate failure to provide reasonable accommodations violated:

- Plaintiff's and D.L.'s rights under the First, Fifth, and Fourteenth Amendments;

- Title II of the Americans with Disabilities Act (42 U.S.C. § 12132 et seq.);

- Section 504 of the Rehabilitation Act;

- Kansas Bill of Rights §§ 1 and 18;
- and DCF policies PPM2 §§ 0315–0317, 10200, 0220, and associated mandates.

## B. Injunctive Relief

Equitable and prospective relief to remedy ongoing violations and prevent further retaliation, including:

1. Access to Records: An order requiring Defendants to provide full and unredacted access to all case records pertaining to the abuse referrals, reports and assessments concerning D.L., including any KIDS system entries, internal emails, supervisor notes, and assessment findings withheld from Plaintiff.

2. ADA Compliance: An injunction mandating that Defendants accommodate disability-related communication needs in any future contact with Plaintiff, including:

   - honoring Plaintiff's email-only communication request;
   - documenting and responding to ADA accommodation requests as required under PPM2 § 0220;
   - engaging ADA-coordinator oversight in any remaining or future state services relating to Plaintiff or D.L.

3. Anti-Retaliation Order: A formal Court order prohibiting Defendants from retaliating, harassing, or excluding Plaintiff or D.L. in any future administrative action, KORA requests, or protective service proceedings as a result of their assertion of ADA rights.

4. Case Record Correction or Supplementation: An order requiring Defendants to allow Plaintiff to submit corrections or rebuttals to false or incomplete documentation relied upon in past decisions.

5. Independent Review or Referral: An order requiring Defendants to recommend that an independent DCF unit, not affiliated with Miranda or Dunz, review the handling of the 2024 and 2025 abuse referrals to determine whether a reopened investigation or referral to law enforcement is appropriate in light of suppressed disclosures, ADA interference, and documented risk to D.L.

## C. Compensatory Damages

Pursuant to 42 U.S.C. § 1983, § 12133, and applicable federal common law:

- Emotional Distress: For Plaintiff's anguish caused by exclusion, stonewalling, retaliation, and failure to protect her son.
- Loss of Familial Association: For the coerced disruption of her parenting relationship with D.L. through state-enabled alienation.
- Out-of-Pocket Costs: For therapeutic services, medical expenses, records fees, travel, and litigation support incurred due to Defendants' wrongful acts.

Amount to be proven at trial.

## D. Punitive Damages (Individual Capacity Only)

Against Amanda Miranda and Heather Dunz in their personal capacities, for willful and malicious violations of Plaintiff's federal rights. Defendants knowingly fabricated findings, violated DCF confidentiality protocols, ignored ADA grievances, and acted with gross disregard for Plaintiff's civil and parental rights.

E. Costs and Attorneys' Fees: Plaintiff requests an award of reasonable attorneys' fees and litigation costs under 42 U.S.C. § 1988(b) (civil rights actions) and 42 U.S.C. § 12205 (ADA claims), including all expenses necessary to prepare, file, and prosecute this case. Though Plaintiff is pro se, courts have recognized that self-represented litigants may seek reimbursement for out-of-pocket litigation costs, including: Research and document preparation time; Filing and service fees; Medical and educational records retrieval; Expert consultations and declarations (where applicable); Transportation, mailing, and document reproduction; Loss of income or employment disruption directly caused by litigation burden, especially for disabled litigants under ADA hardship standards. Plaintiff requests that the Court retain jurisdiction to evaluate and award all post-judgment fee petitions, including any supplemental pro se recoverable costs or conversion to attorney fees if counsel is retained before final judgment.

F. Appointment of Counsel: While Plaintiff proceeds pro se, she respectfully notifies the Court that, given the complexity of the case and her dual role as a disabled litigant and next friend for her child, appointment of counsel may be appropriate pursuant to D. Kan. Rule 83.5.3.1 and 28 U.S.C. § 1915(e). The Court's local rules recognize the importance of counsel in civil rights cases and the need to ensure pro se litigants can fairly present their claims. Plaintiff seeks any such relief in the Court's discretion to level the playing field.

G. Further Relief: Any other and further relief the Court deems just and proper, including equitable relief tailored to protect D.L.'s well-being insofar as federal law permits. That all prior filings be deemed incorporated, that this Court retain jurisdiction to enforce any relief granted, and that Plaintiff be granted such further equitable, legal, or declaratory relief as justice requires.

Jury Demand: Plaintiff demands a trial by jury on all issues so triable.

Trial By Jury Demand

Pursuant to the Seventh Amendment, Plaintiff demands a jury trial on all triable issues. Dismissal is improper where material facts are in dispute regarding ADA retaliation, the destruction of abuse reports, disputed authorship of emails, and pattern of obstruction. See *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959).

Where material facts are in dispute such as the existence and timing of ADA grievances, authenticity of emails submitted to court, and whether Plaintiff was labeled the problem by DCF these questions must be adjudicated by a jury under *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986), *Beacon Theatres*, and the Seventh Amendment. This court lacks authority to resolve disputed facts at the Rule 12(b)(6) stage.

Exhibit A: Power of Attorney – ADA Advocate and Next Friend Designation for D.L.

Respectfully submitted,                                    Dated: November 30, 2025

/s/ Angeliina Lynn Lawson

Angeliina Lynn Lawson

Plaintiff, Pro Se and Next Friend to D.L.

ADA-Protected Litigant and Advocate

1914 5th Ave., Leavenworth, KS 66048

CERTIFICATE OF SERVICE


On November 30, 2025 I certify that a true and correct copy of the foregoing was served via the

Court's CM/ECF system on all registered parties on this date.


/s/ Angeliina Lynn Lawson

Angeliina Lynn Lawson

Plaintiff, Pro Se and Next Friend to D.L.

ADA-Protected Litigant and Advocate